**John Henry CASEY, Petitioner–Appellant,**

v.

**Robert MOORE, Respondent–Appellee.**

No. 03–35294.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 1, 2004.

Filed Oct. 12, 2004.

John Henry Browne (argued), Browne & Ressler, Seattle, WA, for the petitioner-appellant.

Diana M. Sheythe, Assistant Attorney General, Olympia, WA, for the respondent-appellee.

Paul D. Weisser (argued), Deputy Attorney General, Olympia, WA, for the respondent-appellee.

Before CANBY, WARDLAW, and GOULD, Circuit Judges.

GOULD, Circuit Judge:

John Henry Casey appeals the district court's denial of his habeas petition, insisting that a biased jury that was convened for a trial in an improper venue convicted him after considering impermissible hearsay evidence, and after improper closing argument from the prosecutor, all in violation of the United States Constitution. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253, and we affirm in part and dismiss in part.

## I

We set forth first John Casey's testimony about how his wife was shot and died. We next discuss the facts most pertinent to John Casey's claim of improper venue. Finally, we review briefly the facts pertinent to John Casey's claims of improper admission of hearsay testimony and of alleged prosecutorial misconduct in closing argument.

### A

While with her husband John Casey in the garage of their home in Wenatchee, Washington, on October 11, 1998, Rosemary Casey was shot by a bullet fired from John Casey's semiautomatic .30–06 caliber hunting rifle. Only John Casey's version of the shooting incident survives, as Rosemary Casey died in a hospital shortly after suffering the gunshot wound.

At his trial in Chelan County Superior Court on charges for second degree murder, second degree felony murder, and first degree manslaughter, John Casey offered the following testimony: The day before the shooting, he had gone hunting with one of Rosemary Casey's colleagues from the hospital at which Rosemary Casey worked as a physician. While cleaning the van that he used for the hunting trip, John Casey decided to oil his rifle by spraying Break Free oil down the barrel because the barrel was rusty. After placing a piece of cardboard and some rags over a garbage can—which served as a makeshift workspace he planned to use to clean the gun—John Casey moved the slide on the rifle back and no shell ejected or was visible. He let the slide close, and started to oil the rifle. Next, he went back to cleaning the van. In John Casey's testimonial of the critical events, Rosemary Casey then came into the garage to help unload some of the clothing and blankets from the van.

John Casey gave his account of an accidental death: He testified that he asked Rosemary Casey to help him clean the gun by blowing air down the barrel from an air compressor. John Casey told the jury that while he held a rag over the rifle's action (to catch the cleaning solvent as it was forced through the barrel), Rosemary Casey tried to force air down the barrel with an air compressor nozzle. John Casey further testified that when none of the oil that he had placed in the rifle came out, despite air having been blown into the barrel, he turned the rifle over. His key defensive testimony was that he then unintentionally touched the trigger, causing the gun to fire a bullet that struck Rosemary Casey in the chest.

John Casey summoned help from a neighbor, who called 911. An ambulance arrived and rushed Rosemary Casey to the hospital. She was later flown to Seattle for treatment but, regrettably, she died the next day from the gunshot wound.

## B

Law enforcement viewed the case differently, and accused John Casey (hereafter referred to as "Casey") of second degree murder, felony murder, and manslaughter. Before jury selection began, Casey moved for a change of venue, arguing that prejudicial pretrial publicity in Wenatchee's only daily newspaper, the *Wenatchee World*,[1] together with small-town gossip and reports on the local radio about the shooting incident, made it impossible for him to have a fair trial there. The court noted that the circulation of *Wenatchee World* was 29,000 papers on weekdays and 30,000 on weekends, and that the number of potential eligible jurors in the county was 60,000. The parties disagreed, however, about whether the paper's circulation covered additional counties beyond Chelan County, which would lessen the impact of the paper on the readership in the county from which the prospective jury panel would be drawn. The district court denied the motion for change of venue. However, the court reserved to Casey the right to renew his motion after jury selection began. Eighty six prospective jurors answered inquiries in a special jury questionnaire regarding their knowledge of the case, their knowledge of the parties, their familiarity with firearms, whether they had been exposed to pretrial publicity from newspaper articles or radio reports, whether they had discussed the case with anyone, whether they had formed an opinion about the case, and whether jury duty would cause undue hardship. Casey renewed his change of venue motion before jury selection began, but the court denied the motion and continued with voir dire.

The court permitted nine peremptory challenges, three more than usual for a felony case. Of the 86 potential jurors in the pool, 34 or 35 jurors indicated in the questionnaires that they had formed some opinion about the case, and they were excused. Fifteen others were excused for hardship reasons. Casey's counsel asked the jury panel members in general voir dire whether they regularly read the *Wenatchee World* news paper. Twenty-five indicated that they had, and of these, two were seated on the final jury panel. Nine jurors indicated that they had heard that Casey was a homemaker and that his wife was the person who earned the income for the family; these nine jurors were excused. None of the eleven jurors who indicated that he or she had close friends who were doctors was seated on the jury panel. Six jurors said that they, or persons close to them, were patients of Rosemary Casey, and these jurors felt that their opinion might be in some way affected by the relationship; none of these six jurors was seated on the final jury. Both parties exercised all nine of their peremptory challenges. As in general voir dire, in individual voir dire (conducted in the judge's chambers outside the presence of the other jurors), the court excused all jurors who said that they had formed opinions about the case or who expressed that it would be difficult for them to be impartial.

1. On October 25, 1998, the *Wenatchee World* featured an obituary for Rosemary Casey. Three days later, the paper ran a news story entitled, "Police Reviewing Evidence in Casey Shooting." On December 10, 1998, an article appeared with the title, "Family Able to Bury Dr. Casey; Police Still Await Lab Report." On January 6, 1999, an article appeared entitled, "Prosecutor Waits for Casey Evidence."

The following month, the *Wenatchee World* reported that Casey had been arrested and faced second degree murder charges. Another article appearing March 1, 1999 quotes the prosecutor as saying, "There are no witnesses to the shooting. You have to rely on [Casey's] explanation of what happened and whether that is deemed to be reasonable. He admits to shooting her."

Of the forty-three prospective jurors questioned individually in voir dire, three were seated on the final jury panel. Juror Simpson was questioned about a response she had writ ten in the special questionnaire where she wrote, "I don't believe guns go off accidentally in the hands of adults." Defense counsel asked her, "Do you feel like you prejudged Mr. Casey in respect to this matter or are you willing to listen to the facts that you hear in the courtroom, to make your decision then?" She replied, "Yes." As a follow-up to this ambiguous answer, defense counsel asked, "Are you saying, therefore, that you feel you have formed an opinion concerning perhaps your feeling on the outcome of the case, the way it stands now?" Juror Simpson replied, "The limited amount of knowledge that I have at this point, which is not very much. I have a feeling, yes, what I feel yes, is what I feel. I'm willing to listen and form my opinions as I hear the evidence presented." Defense counsel prodded further, "So you are open and if the evidence would support guilty you would go that way; if it supports not guilty, you feel you could go that way," to which she replied, "Yes." She also stated that she had no qualms going either way.

Juror Lind, who was also questioned individually, said that she knew two scheduled witnesses, Dr. Mike Anderson (who had treated her son) and Dr. Lisa Peterson (who had treated her on one occasion). Lind indicated that she had not formed an opinion about the case, that she had not spoken to either witness about the case, and that she would not give more weight or credence to those two witnesses than to others.

The third juror who was evaluated individually, Juror McLaren, expressed concern that the extensive questioning at voir dire might cause some jurors to make assumptions and form opinions: "I was

... a little afraid or worried that perhaps your questions might lead to some of us forming opinions. I kept thinking, boy, maybe"—She was reminded that the individual voir dire was conducted in closed chambers. The juror gave an assurance that she would be fair in the case, and that if she were Casey she would want herself on the jury, "because I am a very honest person, but not by choice."

After the jury was seated, Casey again renewed his motion to change venue, arguing that the jury had been contaminated by pretrial publicity and that the trial was the topic of wide spread discussion in Wenatchee. Again, the court denied the motion, noting, *inter alia,* that although many prospective jurors had familiarity with the case, both parties were given "an unrestricted ability to question the jurors in general voir dire and individually," and that the court had excused "all jurors who expressed even some concern about the ability to be fair, and not be able to set aside their feelings...." The court also noted that it granted Casey's request for nine peremptory challenges and that Casey had not asked for more.

### C

At a pretrial hearing, the state court ruled that the government would be permitted to introduce evidence through six witnesses of statements that Rosemary Casey allegedly made before her death regarding her marriage. The court ruled that the evidence was relevant to rebut Casey's defense that the shooting was accidental and that it fell within the "state of mind" exception to the hearsay rule. The court also ruled that the state would be permitted to introduce evidence of Casey's statements and actions after the shooting. The witnesses ultimately testified about things Rosemary Casey said to them regarding conflict in her marriage and her

general unhappiness during the months before her death. The state was also permitted to present evidence of Casey's ownership of and experience with firearms, and evidence of Rosemary Casey's dislike of guns.

During closing remarks, the prosecutor argued to the jury that the issue at the heart of the case was, "who do you believe?" The prosecutor told the jury, "your job is to deter mine based on the evidence you heard who do you believe, Rosemary or John?"

The jury convicted Casey of second degree murder and second degree felony murder. Including a mandatory sixty-month firearm enhancement, Casey was sentenced to 240 months confinement.

## II

### A

Casey appealed his conviction to the Washington Court of Appeals asserting what we believe were only state law claims[2] regarding the alleged hearsay violations and the improper remarks the prosecutor allegedly made in closing argument. The state court of appeals affirmed the second degree murder conviction in an unpublished decision, but vacated the second degree felony murder conviction and remanded for resentencing.

Casey then filed a petition for discretionary review to the Washington State Supreme Court, this time including federal law arguments for claims that until then had been argued only on a state law basis. The state supreme court denied the petition without comment. The Washington

Court of Appeals issued its mandate on October 22, 2001.

### B

After denying habeas relief to Casey on the merits of all grounds asserted, the district court granted a certificate of appealability for the following claims:[3] (1) improper denial of Casey's motion to change venue on account of prejudicial pre-trial publicity; (2) erroneous denial of his right to confrontation; and (3) prosecutorial misconduct in closing argument. The State of Washington argued to the district court that the latter two claims were not properly exhausted in state court, but the federal district court held that, absent an explicit holding by the Washington State Supreme Court that its decision rested on procedural grounds, it must have reached and rejected the merits of Casey's claims.

We address and deny on the merits the first claim concerning denial of the change of venue motion. But we dismiss the latter two claims, concerning the hearsay testimony and prosecutor's closing argument, because these claims, although exhausted at the time Casey filed for habeas relief in the federal district court, were procedurally defaulted and cannot be considered in federal court.

### III

■ We review de novo the district court's decision to deny the petition for habeas corpus. *Dows v. Wood,* 211 F.3d 480, 484 (9th Cir.2000). We review the district court's factual findings under the "clearly erroneous" standard. *Hendricks*

---

**2.** See discussion *infra* Section V.A.

**3.** Issues for which the district court did not grant a certificate of appealability, but which were denied by the district court on the merits, include Casey's claim about the state's impermissible destruction of exculpatory evidence, and the state's allegedly erroneous use of legal gun ownership to imply guilt. Those issues are not before us.

*v. Calderon,* 70 F.3d 1032, 1036 (9th Cir. 1995).

■■■■ This habeas petition from state court is governed by the Antiterrorism and Effective Death Penalty Relief Act of 1996 (AEDPA), 28 U.S.C. § 2254(d). Under AEDPA, to obtain relief, a petitioner must demonstrate that the state court's adjudication of the merits resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts. *Id.* A state court decision is "contrary to" clearly established U.S. Supreme Court precedent if the state court "applies a rule that contradicts the governing law set forth" in decisions by the Supreme Court or "confronts a set of facts that are materially indistinguishable from [Supreme Court] precedent," but arrives at a different result. *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The state court decision is an "unreasonable application" of clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts" of the case. *Id.* at 407–08, 120 S.Ct. 1495.

## IV

Casey argues that the district court should have granted his motions for a change of venue, and that he was denied his constitutional right to a trial before a fair and unbiased jury. He maintains that extensive and unfairly prejudicial media coverage permeated the trial atmosphere and that, in light of the small size of the Wenatchee community and Rosemary Casey's prominent position within it,[4] the ju-

rors were biased in her favor before the trial began. Casey contends that the community held a widespread belief, based on news reports and word-of-mouth gossip, that Casey was guilty, and that "[w]hen, as here, a death occurs in a small community and captures the community's attention, widespread publicity . . . creates an atmosphere that is antithetical to a fair trial." Casey's argument relies in part on the statements of several potential jurors who during voir dire said that Casey could not get a fair trial in Wenatchee, Washington. Although Casey does not argue that the twelve jurors who eventually served on the case had already made up their mind about his guilt, he does argue that virtually all of the jurors were familiar with the facts of the case, had heard discussions about the case out side of the courtroom, knew witnesses in the case, or were influenced by the answers in general voir dire in which many jurors had indicated that they had formed opinions about the case.

■■■■ When we consider whether prejudicial pretrial publicity required a change of venue, we are addressing an issue of fundamental fairness in the trial process by which guilt or innocence will be determined, and, as a result of which, a defendant may lose liberty as punishment for crime. Because our society values, and the First Amendment to our Constitution protects, a free press that may wish to regularly comment on what the press perceives to be a crime of notoriety, an inherent tension can arise with the critical right of a criminal defendant to receive a fair trial. *See generally* Alfredo Garcia, *Clash of the Titans: The Difficult Reconciliation of A Fair Trial and A Free Press in Modern American Society,* 32 Santa Clara L. Rev. 1107, 1110 (1992) (tracing this tension back to the celebrated 1807 trea-

---

4. Dr. Rosemary Casey headed the Woman's Healthcare Clinic at Central Washington Hospital, which served as a major employer in the county.

son trial of Aaron Burr, whose controversy with President Jefferson "led Burr's attorneys to question the ability of jurors who had followed the feud[in the media] to act impartially"). *See also* Charles H. Whitebread & Darrell W. Contreras, *Free Press v. Fair Trial: Protecting the Criminal Defendant's Rights in a Highly Publicized Trial By Applying the Sheppard–Mu'Min Remedy*, 69 S. Cal. L. Rev. 1587, 1615 (1996) ("The value of changing venue as a remedy for pretrial publicity has been diminished due to technological advances ... [the] option is only available if the impact of the case is confined to a local area."). Issues of pre-trial publicity and potential venue change must be decided with the broader issues of free press and fair trial in mind.

■ "The standards governing a change of venue ultimately derive from the due process clause of the fourteenth amendment which safeguards a defendant's sixth amendment right to be tried by 'a panel of impartial, indifferent jurors.'" *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir.1988) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (superseded on other grounds by statute)). The Washington Court of Appeals reviewed for an abuse of discretion the trial court's denial of the motions to change venue on account of the prejudicial pre-trial publicity. Applying a nine-factor test under Washington law, the state court held that Casey had not dem-

onstrated a "probability of unfairness" justifying a change of venue.[5] Under our precedent, if pretrial publicity makes it impossible to seat an impartial jury, then the trial judge must grant the defendant's motion for a change of venue. *Harris v. Pulley*, 885 F.2d at 1361.

■ Casey contends that the facts of his case meet the presumed prejudice standard of *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), because he has shown a "reasonable likelihood that prejudicial news prior to trial ... prevent[ed] a fair trial." He also claims that "the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris v. Pulley*, 885 F.2d at 1361. We rarely find presumed prejudice because "saturation" is "reserved for an extreme situation." *Id.* (internal quotation marks omitted). Casey cites to cases that are not from the United States Supreme Court with facts that he alleges are akin to those presented in his case. *See, e.g., Nickolai v. State*, 708 P.2d 1292 (Alaska Ct.App.1985) (holding that a change of venue was warranted because of the small population of the area and the fact that the defendant and victim were well known); *People v. Tidwell*, 3 Cal.3d 62, 69–70, 89 Cal.Rptr. 44, 473 P.2d 748 (Cal.1970) (noting holding in *People v. McKay*, 37 Cal.2d 792, 796–97, 236 P.2d 145 (Cal.1951), that change of venue was warranted where a

---

5. Under Washington case law, a state appellate court considers the following nine factors in assessing whether a trial court has abused its discretion in denying a change of venue: (1) the inflammatory or non-inflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the

selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn. *State v. Crudup*, 11 Wash.App. 583, 524 P.2d 479, 482 (1974).

small community's "overt rage had, by the time of trial, been replaced by a cool, widely held conviction that defendants were guilty and should be tried and sentenced to death as expeditiously as possible") (internal quotation marks omitted). However, because these cases are not clearly established law as determined by the United States Supreme Court, they are not controlling precedents under the standard required by AEDPA. Under AEDPA we must look to the direct precedent of the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). Although lower federal court and state court precedent may be relevant when that precedent illuminates the application of clearly established federal law as determined by the United States Supreme Court, if it does not do so, it is of no moment.

■■■■■ The Supreme Court's landmark *Sheppard* case requires us to assess whether Casey has shown a "reasonable likelihood that prejudicial news prior to trial ... prevent[ed] a fair trial." 384 U.S. at 363, 86 S.Ct. 1507. In evaluating whether pretrial publicity so saturated the community as to warrant a presumption of prejudice, the Supreme Court has considered whether there was a "barrage of inflammatory publicity immediately prior to trial amounting to a huge wave of public passion." *Patton v. Yount,* 467 U.S. 1025, 1033, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (internal quotation marks and citation omitted). "An additional factor is whether the media accounts were primarily factual, as such accounts tend to be less prejudicial than inflammatory editorials or cartoons." *Ainsworth v. Calderon,* 138 F.3d 787, 795 (9th Cir.1998), as amended, 152 F.3d 1223 (9th Cir.1998) (suggesting that there is no presumption of prejudice where most media accounts were primarily factual in nature and, as here, were printed several months before trial).

■■■ Here, the newspaper articles were largely factual in nature. The first article mentioned that investigators had not "yet ruled on the manner of death," and that some evidence had been lost by law enforcement authorities; the second article quoted exculpatory statements by Casey; the third noted that Casey was not "top priority for the crime lab"; the fourth quoted Casey faulting the police's competency; the fifth was an obituary for Rosemary Casey; and the sixth was an account of Casey's arrest. We note two arguably prejudicial items in the articles. These are a quote from the prosecutor noting that the crime lab determined that the hunting rifle functioned properly, which might imply that it would not likely discharge on an accidental touch; and the prosecution's quote, "There are no witnesses to the shooting. You have to rely on [Casey's] explanation of what happened and whether that is deemed to be reasonable. He admits to shooting her."

As for the former, it reports on a typical form of evidence, which might be commented upon or addressed by either the prosecution or the defense, but it cannot be viewed as sufficient to create entrenched prejudice. The pretrial publicity on the crime lab report about the gun's normal functioning is not sufficient to require a venue change as a result of this routine reporting. As for the latter, Casey makes much of the prosecution's quote, but what the prosecutor said is largely factual and not in dispute. Casey admitted that the rifle in his hands shot Rosemary Casey; the question at trial was whether, on the one hand, he shot with intentional purpose or a state of mind sufficient for conviction on any of the charges, or, on the other hand, whether the gun discharged accidentally and innocently as Casey testified.

The remainder of the articles note that there was no clear motive for an intentional killing, that Casey might be unfairly targeted by a jilted prosecutor whose poor record on child sex abuse cases was under public scrutiny, and that Casey allegedly proffered two contradictory accounts of what had happened on the day of the shooting. We cannot say, on this record, that the newspaper articles taken as a whole represented "a barrage of inflammatory publicity immediately prior to trial amounting to a huge wave of public passion." *Patton*, 467 U.S. at 1033, 104 S.Ct. 2885 (internal quotation marks and citation omitted).

Although the media accounts were not flattering to Casey, the degree of any resulting prejudice did not come close to meeting that displayed in *Irvin, Sheppard,* or *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In *Irvin,* the community had become so obsessed with its anticipation of the criminal trial of the defendant that a roving reporter solicited bystanders' views about the defendant's guilt (including the punishment they thought he deserved) and later broadcast the opinions over local stations, together with a list of criminal and military crimes the petitioner had committed as a juvenile and as an adult. Newspaper articles leading up to the day of trial covered everything from the fact that defendant had failed a lie detector test to the fact that he had ultimately confessed to murdering six people (calling him repeatedly the "confessed slayer of six."). *Irvin,* 366 U.S. at 725–26, 81 S.Ct. 1639. The articles in Casey's case in no way match—in quantity or quality—the media reports in *Irvin.* Denying the motion was not contrary to clearly established federal law as stated in *Irvin.*

In *Sheppard,* the U.S. Supreme Court described the pretrial publicity as "massive," "pervasive," and "virulent," including a broadcast three months before trial of a five-hour interview of the defendant without counsel. 384 U.S. at 335, 354, 86 S.Ct. 1507. The television program featuring the interview resulted in a public brawl, and the trial court did an inferior job of later containing the bustling and intrusive media reporters at the live and televised trial.[6] Jurors were even photographed throughout the trial, and pictures of them were printed in daily newspapers to which they had access (because they were not sequestered). *Id.* at 343–44, 86 S.Ct. 1507. Here, no such challenge is made about the way the trial was run except to mention routine and inevitable gasps heard in the courtroom by a few audience members.

Likewise, in *Rideau v. Louisiana,* the defendant's taped confession to robbing a bank, kidnapping three of the bank's employees, and killing one of them, had been broadcast by the news media three times to tens of thousands of people in that area. 373 U.S. at 724, 83 S.Ct. 1417. At trial, the court denied a motion for a change of venue. The Supreme Court held that the denial of the motion violated the due process clause, noting, among other things, that three of the jury members who convicted the defendant had witnessed on television the taped confession.

■ The facts of Casey's case do not approach the egregious ness outlined in these Supreme Court cases. Here, the trial court properly found that the "publicity" about the case in the local newspaper and on the radio station was not inflamma-

---

**6.** As the Court explained, "[W]e believe that the arrangements made by the judge with the news media caused Sheppard to be deprived of that judicial serenity and calm to which he was entitled." *Sheppard,* 384 U.S. at 355, 86 S.Ct. 1507 (internal quotation marks omitted).

tory and was largely factual in nature. Although the town only had one daily newspaper, the parties disputed the breadth of its circulation in the relevant region, because the newspaper covered a four-county area and enjoyed a *total* circulation of only 29,000. (Chelan County has an eligible jury population of approximately 60,000.) In any event, as the court of appeals noted, the bulk of the newspaper articles appearing in the *Wenatchee World* were printed between October 12, 1998, and February 26, 1999, four to eight months before jury voir dire started.[7] The trial court did not think a change in venue was required under these circumstances, and its interpretation was not unreasonable or contrary to clearly established federal law.

■■■ Citing *Irvin v. Dowd* Casey also argues that the facts of his case prove actual prejudice because jurors demonstrated actual partiality or hostility that could not be laid aside. In *Irvin*, 370 prospective jurors, or almost 90% of those examined on the point, at one time had entertained some opinion as to guilt, 268 jurors were excused for cause for having fixed opinions as to guilt, and eight of the twelve jurors empaneled thought the petitioner was guilty. 366 U.S. at 727, 81 S.Ct. 1639. Here, only three of the jurors seated on the jury panel were told to respond to individualized questioning on voir dire, and not half of the original jury pool had formed opinions about Casey's guilt or innocence. Not one juror seated on the eventual panel had said that he or she had definitely formed opinions about the case, and none harbored hostility against Casey that he or she said could not be set aside after hearing evidence.[8]

Although town gossip spread about Casey's trial, nobody in the jury admitted to having formed a predisposition based on rumor.[9] As the Supreme Court reasoned in *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975):

> To hold that the mere existence of any preconceived notion as to the guilt or

7. Casey maintains that the impact of any delay between publicity and trial is mitigated in his case because of the small size of his community. Citing *People v. Williams*, 48 Cal.3d 1112, 259 Cal.Rptr. 473, 774 P.2d 146, 155 (1989), Casey contends that "in small communities, where a crime becomes embedded in the public consciousness the[] effectiveness [of delays] is greatly diminished." However, this principle is not clearly established federal law as decided by the Supreme Court, so it is not unreasonable for the state court to consider that the amount of time that passed between the shooting incident and the trial worked in Casey's favor.

8. Casey points to the voir dire statement of Juror No. 15 that she didn't believe guns "accidentally go off" in adults' hands. However, defense counsel further asked her whether her mind was still "open and if the evidence would support guilty you would go that way; if it supports not guilty, you feel you could go that way?" to which she replied, "Yes." She also said that she had no qualms about the verdict coming out either way. The second juror who was asked individualized questions knew one of the witnesses, but she assured the defense counsel that she had not seen the witness in two years, did not discuss the case with her, and had not formed an opinion about the case. The third juror subjected to individualized questioning was a woman who worried that incessant voir dire questioning might have planted ideas in some jurors' heads. Still, she answered "yes" to the question whether she could be fair.

9. The jurors whose statements Casey cites in his brief—"Wenatchee is a gossip town," "everyone at the hospital thinks that Dr. Casey's death was not an accident," "it is hard not to listen to people you respect," the jurors "obviously heard people talk about the case," and the case was a "topic of discussion anywhere you go for coffee"—were excused and did not serve on the jury that convicted him. Those who had heard discussions about the case but who maintained that they had not formed opinions were not excused.

innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

(quoting *Irvin*, 366 U.S. at 723, 81 S.Ct. 1639); *see also Jeffries v. Blodgett*, 5 F.3d 1180, 1189 (9th Cir.1993) (holding that no actual prejudice occurred even though almost all of the jurors had heard or read about the case prior to trial, because all of the jurors swore under oath that they could judge impartially the defendant's guilt or innocence).

■■■ Whether a jury was biased is a question of fact. The trial court's finding on this question is entitled to a presumption of correctness. *Lincoln v. Sunn*, 807 F.2d 805, 814 (9th Cir.1987). The trial judge in this case proceeded carefully and cautiously, assessing the jurors' credibility, demeanor, and potential for bias. The judge granted more peremptory challenges than usual, and Casey did not request additional ones. The trial court also allowed the defense unrestricted opportunities to question jurors in general and in individual voir dire.

Casey renewed his motion for a change of venue two times—once after the jury answered the special questionnaires, and again after the jury was seated. Each time, the trial judge evaluated the state law factors pertinent to the venue analysis.

All prospective jurors who indicated that they had formed preliminary opinions about the trial were excused, as were prospective jurors who had been treated by Rosemary Casey or who were otherwise connected to the case in a way that would render them biased.[10]

The state court of appeals concluded that the parties were able to select an impartial jury despite widespread knowledge of the case. Because this decision denying Casey's claims of jury bias and improper venue was not contrary to, or an unreasonable application of, clearly established federal law, or made on the basis of an unreasonable determination of the facts in light of the evidence before the trial court, Casey is not entitled to relief on this claim.

## V

■■■ The two remaining claims certified for this appeal relate to the trial court's admission of hearsay evidence allegedly in violation of Casey's rights under the Confrontation Clause of the U.S. Constitution, and the prosecutor's allegedly improper remarks during closing argument. The government argues that these two federal issues were not fairly presented to the Washington state courts and that Casey is now procedurally barred from presenting them on account of a one-year time limit in Washington for bringing collateral proceedings challenging a conviction.[11] We agree with the government.

---

10. The Supreme Court in *Murphy* determined that it was not unusual in a highly publicized case to excuse twenty persons from a pool of nearly eighty. 421 U.S. at 803, 95 S.Ct. 2031.

11. Although the government does not cross-appeal the fair presentation issue, we may still review the district court's determination that no procedural bar prevented an adjudication on the merits, because the government is not asking for more relief than was granted in

the district court. *See El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999) (noting that even without cross-appeal appellee may assert any ground for affirmance that is apparent on the record so long as it does not enlarge the relief previously given appellee below); *Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1168, n. 1 (9th Cir.2003) (holding that Respondent's argument that the district court should have

## A

The United States Supreme Court, in its most recent opinion about fair presentation in habeas cases, stated:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court ... thereby alerting that court to the federal nature of the claim.

*Baldwin v. Reese,* 541 U.S. 27, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004) (internal quotation marks and citations omitted). *See also Duncan v. Henry,* 513 U.S. 364, 365–66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (holding that to fairly present a federal claim to a state court for exhaustion purposes, petitioners must alert the state court "to the fact that the prisoners are asserting claims under the United States Constitution").

On appeal to the intermediate state appellate court in Washington, Casey argued, *inter alia,* that the trial court had erroneously admitted evidence of prior misconduct, or unsympathetic conduct, of Casey through hearsay evidence. Casey's brief cited only to state law cases and did not use the terms "federal" or "Confrontation Clause." His references to the "Supreme Court" were to the State of Washington's highest court. Although in his appellate brief Casey used the term "constitutional error" twice, and once stated that he was deprived of a "right to confront witnesses," he did not refer expressly to the federal constitution or to any of its provisions. The cases i cited for the hearsay challenges were state law cases discussing generally state law evidence requirements for admissibility.[12] Casey did

---

dismissed the habeas petition as a successive petition, rather than decide the claim on the merits, was not required to have been raised as a cross-appeal, because "Respondent is not asking for more relief than that granted by the district court").

12. In his brief to the court of appeals, Casey relied heavily on *State v. Powell,* 126 Wash.2d 244, 893 P.2d 615 (1995), but he never asserted that *Powell* discussed or supported a *federal* claim. The main thrust of *Powell's* initial analysis involved whether certain hearsay statements introduced at trial satisfied state law exceptions to state hearsay rules. Concluding that some statements did not meet the state law hearsay exceptions and "should not have been admitted," the *Powell* court assessed under a "reversible error" standard whether the statements "deprive[d] the defendant of the right to confrontation." *Id.* at 628. Although the *Powell* court mentioned a confrontation right, it is unclear from the opinion whether that right is the federal or state constitutional right, because the State of Washington's constitution, like that of the United States, recognizes a right of confrontation. *See* Wash. Const. art. I, § 22. After

articulating the harmless error standard for admission of improper hearsay statements, the *Powell* court cited two Washington state cases—*State v. Hieb,* 107 Wash.2d 97, 727 P.2d 239 (1986), and *State v. Benn,* 120 Wash.2d 631, 845 P.2d 289 (1993). *Powell,* 893 P.2d at 628. The *Powell* court also indicated in a parenthetical that *State v. Benn* quoted the federal case *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). *Id.* If one were to turn to and study *Hieb* and *Benn,* one would find that the *Hieb* court based its decision on the federal and state confrontation clauses, and that it discussed these in tandem. The *Benn* case discussed neither the state nor federal confrontation clause, but mentioned a general right of confrontation bearing on the defendant's challenge to the trial court's alleged undue restriction on the defense's ability to cross-examine a state witness. Further, *Benn's* reference to the Supreme Court's *Bagley* decision was not for federal confrontation clause purposes, but for "determining the materiality of information in nondisclosure situations." *Benn,* 845 P.2d at 300.

If we could consider that Casey's citation to *Powell* incorporated all legal analyses of all

not indicate in parentheticals or elsewhere whether these state cases discussed the federal constitution. Further, when Casey discussed "constitutional error," he cited to

cases cited in *Powell*, then the federal constitutional issue was raised tangentially in *Hieb* when *Hieb* covered the federal and state confrontation clause arguments together. We do not think this theory would set forth a "fair presentation" of the federal constitutional issue to the state court. From Casey's brief, one might conclude that he was asserting only state evidence and state constitutional claims as to the hearsay evidence. *Powell* itself can be read as recognizing only a state right of confrontation, as it does not explicitly say it is applying a federal constitutional right; its references to federal law were explicit only as to the harmless beyond a reasonable doubt standard as articulated in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). To say that federal issues are fairly presented when they can be seen not explicitly in petitioners' brief and not explicitly in the cases cited by petitioner, but only in one of the cases cited by those cases to us seems too remote to be consistent with the Supreme Court's rationale in *Baldwin*, 124 S.Ct. at 1350–51, where it rejected the idea that a state supreme court should be charged with a duty to read the lower court opinion that it was reviewing. Given that holding, we decline to conclude that state supreme court justices may be charged with reading all cases that are cited in the cases on which a petitioner relies, and instead the burden must be on the petitioner to be explicit in asserting a federal constitutional right.

13. In the part of his brief pertaining to whether constitutional error was harmless, Casey cited *State v. Guloy*, 104 Wash.2d 412, 705 P.2d 1182 (1985), but again did not indicate whether the case dealt with federal or state constitutional issues. The *Guloy* court, under the heading "Hearsay Statements in Conspiracy Cases," rejected several state law evidence arguments, and then closed with an additional holding, under the subheading "Sixth Amendment Rights," which addressed the federal right to confrontation under a harmless error standard. *Id.* at 1188–91. Although the *Guloy* state case dealt explicitly with the federal law challenge that Casey raised in his federal habeas corpus petition, there was no way from his briefing for the Washington court of appeals to know that

state cases dealing with his state-law claims, without giving any indication that the cases also dealt with federal law and that he was citing them for that purpose.[13]

*Guloy* involved federal constitutional rights. Casey did not include a textual statement in his brief or even a parenthetical after the case citation that would have facilitated the court's search in *Guloy* for any federal legal proposition on which Casey might have hoped to rely. Because *Guloy* addresses state and federal hearsay violations, the state court could not presume that Casey cited *Guloy* for its federal holdings, when nothing about the federal claims were presented in the text of his brief.

In *Baldwin*, the Supreme Court held that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." 124 S.Ct. at 1351. Here, even if the state court read past Casey's brief and read the full text of the cited case *Guloy*, the court would still be unsure whether Casey cited *Guloy* for its treatment of state law hearsay or, instead, for federal law Confrontation Clause grounds. Although the Supreme Court also noted in *Baldwin* that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim … a case deciding such a claim on federal grounds," *id.*, we conclude that "this language must still be applied with common sense and in light of the purpose underlying the exhaustion requirement, 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" *McNair v. Campbell*, 315 F.Supp.2d 1179, 1184 (M.D.Ala.2004) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)). For a federal issue to be presented by the citation of a state decision dealing with both state and federal issues relevant to the claim, the citation must be accompanied by some clear indication that the case involves federal issues. Where, as here, the citation to the state case has no signal in the text of the brief that the petitioner raises federal claims or relies on state law cases that resolve federal issues, the federal claim is not

Like the part of Casey's brief to the court of appeals relating to the hearsay violations, in the part of his brief relating to his prosecutorial misconduct claim, Casey cited only to state law cases. He did not use the term "due process" or refer to the federal constitution.

Notwithstanding that there was no indication textually or through citations that Casey's state court of appeals brief raised federal claims, he maintains that he did fairly present to the state court of appeals the Confrontation Clause and due process claims relating to prosecutorial misconduct. His arguments are unavailing.

First, Casey relies on *Reutter v. Crandel*, 109 F.3d 575 (9th Cir.1997), where we held that the exhaustion requirement was satisfied because the petitioner had adequately presented a Confrontation Clause claim by including in the state supreme court appeal a reference to the right to fair confrontation of witnesses and citing key federal cases decided on a Confrontation Clause basis. However, unlike Casey, the petitioner in *Reutter* included federal cases in his court of appeals brief, and was "appealing from an opinion of an Alaskan appellate court that had carefully examined this constitutional claim and rejected it." *Id.* at 577–78.

▬▬ Second, Casey suggests that because he discussed "constitutional error" in the state appellate court regarding his hearsay claim—and made a bare reference to "depriv[ation] of a fair trial" regarding

his prosecutorial misconduct claim—he fairly presented the federal constitutional issues in both instances. We are not persuaded that such a vague appeal, bolstered only by state law cases that focused on state procedural or state constitutional error, can be said to have fairly presented federal constitutional issues. Even where a petitioner argues that an error deprived him of a "fair trial" or the "right to present a defense," unless the petitioner clearly alerts the court that he is alleging a specific federal constitutional violation, the petitioner has not fairly presented the claim. *See Johnson v. Zenon,* 88 F.3d 828, 830–31 (9th Cir.1996) (holding that where petitioner argued that an evidentiary error was not harmless only under *state* law, petitioner "never apprised the state court of the federal nature of his claim," and did "not satisf[y] the fair presentation prong of the exhaustion requirement"); *see also Shumway v. Payne,* 223 F.3d 982, 987 (9th Cir.2000) ("Shumway's naked reference to 'due process' in Issue I was insufficient to state a federal claim. It is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court. Therefore, Shumway's statement of the issue presented did not 'fairly present' her federal claim to the Washington Supreme Court.") (internal quotation and footnote omitted).

▬▬ Third, Casey relies on a Seventh Circuit case, *Verdin v. O'Leary,* 972

---

fairly presented. We held in *Peterson v. Lampert,* 319 F.3d 1153, 1158 (9th Cir.2003) (en banc), that "for purposes of exhaustion, a citation to a state case analyzing a federal constitutional issue serves the same purpose as a cite to a federal case analyzing such an issue." In *Peterson* the claim was not fairly presented because the petitioner, rather than "simply claim[ing] in his petition that he had been denied his constitutionally guaranteed right to counsel and then cit[ing] to two Ore-

gon cases," used catch phrases for state law inadequate assistance of counsel, which we interpreted as a strategic choice by petitioner's counsel to ground his claims on state rather than federal law bases. *Id.* Here, Casey's citing to a state case discussing both state and federal claims, with no textual mention of a federal claim in Casey's brief on this issue, did not fairly present to the state court of appeals the federal claim now asserted in federal habeas proceedings.

F.2d 1467, 1479–80 (7th Cir.1992), for the proposition that the fair presentation requirement could be satisfied if the petitioner relies on state cases that apply federal constitutional analysis or that refer to the United States Constitution and present a fact pattern typical of constitutional litigation. Not only are we not bound by the reasoning or holding of the Seventh Circuit case, but we have clearly stated that, after the Supreme Court's holding in *Duncan*, the " 'essentially the same' standard is no longer viable," meaning that we cannot assume federal claims were impliedly brought by virtue of the fact that they may be "essentially the same" as state law claims. *Johnson*, 88 F.3d at 830. "If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regard less of its similarity to the issues raised in state court." *Id.*[14]

■ The United States Supreme Court has left open the question whether the invocation of a state constitutional provision is adequate to raise a federal claim under the corresponding federal constitutional clause when the state courts treat both claims in an *identical* manner. *See Baldwin*, 124 S.Ct. at 1352; *see also Duncan*, 513 U.S. at 366, 115 S.Ct. 887 (noting that federal and state claims were no more than "somewhat similar" rather than "virtually identical"). We need not decide that issue here because Casey has not argued or demonstrated that the Washington courts would treat his state confrontation and due process claims identically to the federal claims he now asserts. To determine whether it will treat a claim under a state constitutional clause differently from a comparable federal claim, the Washington Supreme Court applies six non-exclusive criteria to the particular claim before it. *See State v. Gunwall*, 106 Wash.2d 54, 720 P.2d 808, 811 (1986). Casey has not presented the *Gunwall* analysis either to the district court or to us. He there fore has failed to demonstrate that the Washington courts would apply a federal constitutional analysis to the claims he presented to the Washington Court of Appeals.[15]

---

**14.** Casey also argues that the claims were fairly presented to the court of appeals because the state *supreme* court could have determined that the hearsay and prosecutorial misconduct challenges were sufficient to permit review. There is no support in our case law for the legal principle that an issue is fairly presented just because a higher court exercising its discretionary powers to review might choose to consider the federal claims *sua sponte*.

**15.** The Washington Supreme Court has expressly left open the question whether the state confrontation clause was to be applied more strictly than the federal confrontation clause to a claim of improper admission of hear say testimony. *See In the Matter of Grasso*, 151 Wash.2d 1, 84 P.3d 859, 868 n. 12 (2004) (noting that "five members of this court have agreed that Washing ton's confrontation clause offers higher protection than its federal counter part with respect to face-to-face testimony," citing *State v. Smith*, 148

Wash.2d 122, 59 P.3d 74, 78 (2002), but also that "the petitioner offers no *Gunwall* analysis discussing whether the state confrontation clause offers higher protection *in this context* [of hearsay testimony]"). Casey therefore cannot establish that the treatment of federal and state confrontation claims is identical.

With regard to Casey's due process claim, we have been directed to no published opinion determining whether the Washington courts interpret the state due process clause identically to the federal clause in addressing a claim of prosecutorial misconduct in final argument. With regard to a different claim of prosecutorial misconduct—failure to preserve exculpatory evidence—the Washington Supreme Court found no reason to interpret the state due process clause differently from the federal clause. *State v. Wittenbarger*, 124 Wash.2d 467, 880 P.2d 517, 524 (1994). Even if Washington would treat the two clauses the same in the present situation, and we were to conclude that identical treatment was sufficient to exhaust, Casey would not be enti-

We conclude that Casey's federal claims were not fairly presented to the state court of appeals.

## B

■ By contrast, however, in Casey's subsequent briefing to the Washington State Supreme Court in a petition for discretionary review, Casey couched his hearsay claims within a federal constitutional framework, citing *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980),[16] which advanced the proposition that out-of-court statements by unavailable witnesses are inadmissible and violate the federal Confrontation Clause unless the statements lie within a firmly-rooted hearsay exception or are proven to bear adequate indicia of reliability. In the same section, Casey also quoted a scholar on the law of evidence concerning the United States Supreme Court's decision in *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933). Casey did not use the precise phrase "Confrontation Clause" that he used in the federal district court in his habeas petition and in his brief to us on appeal, but he did submit federal precedent to the state supreme court supporting his claim that he was deprived of his "right to con front witnesses." Similarly, in his petition for review to the state supreme court, Casey urged, for the first time, that

"[r]eview should be granted because prosecutorial misconduct is a state and federal constitutional issue," and he bolstered that argument with a federal law case, *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), *overruled on other grounds by Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).[17]

Although Casey's federal constitutional issues concerning the Confrontation Clause challenge to admission of hear say testimony, and the due process challenge relating to the prosecutor's closing argument, were adequately presented in the petition for review to the state supreme court, they were not fairly presented to the state court of appeals before then.

## C

■ Having decided that Casey did not fairly present his federal law claims to the Washington Court of Appeals, the key issue becomes whether Casey fairly presented, and thereby exhausted, his federal claims by virtue of having raised them for the first and only time in his discretionary petition for review to the Washington State Supreme Court.

■ As a general rule, a petitioner satisfies the exhaustion requirement by fairly

tled to habeas relief because he has not shown that the state court's ruling on the prosecutorial misconduct issue was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1).

**16.** *Ohio v. Roberts* was overturned recently by *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), but that is not pertinent to our analysis.

**17.** Notably, the remainder of Casey's claims on appeal to the intermediate state court, which we do not examine here for exhaustion

purposes, properly relied on federal case law and on federal constitutional theory. This is why, for example, there is no question that Casey's first claim, about the denial of his change of venue motion, has been properly exhausted. Casey could have easily and similarly included federal constitutional arguments for his Confrontation Clause and prosecutorial misconduct claims, but we conclude that he did not do so. Whether counsel acted based on strategic or other valid reasons, or was merely ineffective, cannot be assessed on the record before us and was not argued before us, so we do not consider it. These issues were not addressed by the district court in ruling on the habeas petition.

presenting the federal claim to the appropriate state courts (plural) in the manner required by the state courts, thereby "afford[ing] the state courts a meaningful opportunity to consider allegations of legal error." *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The Supreme Court's decision in *Baldwin* suggests that to be fairly presented in the state courts, a claim must have been raised throughout the state appeals process, not just at the tail end in a prayer for discretionary review. As the Supreme Court said in *Baldwin:*

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. To provide the state with the necessary "opportunity," the prisoner must "fairly present" his claim *in each appropriate state court (including a state supreme court with powers of discretionary review),* thereby alerting that court to the federal nature of the claim.

*Id.* at 1349 (internal quotation marks and citations omitted) (emphasis added).

 Even before *Baldwin*, we had held that to exhaust a habeas claim, a petitioner must properly raise it on every level of direct review.[18] *See Ortberg v. Moody*, 961 F.2d 135, 137 (9th Cir.1992) ("The remainder of the petition was properly dismissed because five of the remaining six claims either were not raised on

every level of direct review, or were raised for the first time on habeas. As stated above, only claim number twelve … was raised on every level of direct review."). Academic treatment accords: The leading treatise on federal habeas corpus states, "Generally, a petitioner satisfies the exhaustion requirement if he properly pursues a claim (1) throughout the *entire direct appellate process* of the state, or (2) throughout one entire judicial postconviction process available in the state." Liebman & Hertz, *Federal Habeas Corpus Practice and Procedure,* § 23.3b (4th ed. 1998) (emphasis added). "Whether a claim is exhausted through a direct appellate procedure, a postconviction procedure, or both, the claim should be raised at all appellate stages afforded under state law *as of right* by that procedure." *Id.* (citing *Castille v. Peoples*, 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989)).

With this general principle in mind, we turn to the United States Supreme Court case, *Castille v. Peoples*, that in our view controls decision on the government's argument that Casey did not fairly present his federal constitutional claims in state court before he filed a habeas petition in federal district court. In 1989, a unanimous Supreme Court held in *Castille* that a claim remains unexhausted for lack of "fair presentation" where, as here, it was raised for the first time on discretionary review to the state's highest court and denied without comment. 489 U.S. at 351, 109 S.Ct. 1056. In *Castille*, after the Superior Court of Pennsylvania affirmed, on direct appeal, a defendant's conviction, he raised federal claims for the first time in two "petitions for allocatur" to the Supreme Court of Pennsylvania. In Pennsylvania, an allocatur petition is a request

---

**18.** Of course, a claim is exhausted if the State's highest court expressly addresses the claim, whether or not it was fairly presented. *See Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989).

for a certiorari-like form of discretionary review by the highest state court.[19]

The Supreme Court in *Castille* granted certiorari to decide "whether the presentation of claims to a State's highest court on discretionary review, without more, satisfies the exhaustion requirements of 28 U.S.C. § 2254." *Id.* at 349, 109 S.Ct. 1056. In its unanimous opinion, after noting that the petitioner had raised only state law claims to the intermediate state appellate court, the Supreme Court held that "where the [federal] claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons ... [r]aising the claim in such a fashion does not ... constitute fair presentation." *Id.* at 351, 109 S.Ct. 1056 (internal quotation marks and citations omitted).

The allocatur petition in *Castille* is analogous to the discretionary review Casey sought from the Washington State Supreme Court. Review of the writ in Pennsylvania "is not a matter of right, but of sound judicial discretion, and an appeal will be allowed only when there are special and important reasons therefor." Pa. R. App. P. 1114. Similarly, the Washington State Supreme Court will grant a petition for appeal not as a matter of right, but within its own discretion. *See* Wash. R. App. P. 13.1(a).[20] There is no principled or

logical distinction that we can see that would set Casey's case apart from the precedent of *Castille*.

Our analysis suggests that under *Castille*, Casey did not fairly present his federal law claims when he raised them for the first and only time upon petitioning for discretionary review to the Washington State Supreme Court. This view is consistent with not only a prior suggestion in dicta from our own Circuit, but also with the express holdings of several of our sister circuits, all of which have applied *Castille* without exception in like settings. We review these authorities.

In *Greene v. Lambert*, we noted that:

Because Petitioner's federal claims were raised for the first time in [a discretionary motion for reconsideration,] the Washington Supreme Court would have been within its discretion simply to deny the motion *or to dismiss it without comment.*

Such a dismissal would have brought Petitioner's claim squarely within the reach of *Castille*, 489 U.S. at 351, 109 S.Ct. 1056 (holding that issues raised for the first time in purely discretionary motions are not exhausted for federal habeas purposes when those motions are dismissed without comment).

288 F.3d 1081, 1087 & n. 2 (9th Cir.2002) (emphasis added).[21] We also explained in

---

**19.** As the Third Circuit has explained in an unrelated case, the allocatur petition "is synonymous with 'allowance of appeal,' which is the official term used for petitions to the Pennsylvania Supreme Court. 42 Pa. Cons. Stat. Ann. § 724 (1992)." *Hull v. Freeman,* 991 F.2d 86, 89 n. 1 (3d Cir.1993).

**20.** This discretion is exercised only in limited circumstances:

A petition for review will be accepted by the [Washington] Supreme Court only: (1) If the decision of the Court of Appeals is in conflict with a decision of the Supreme

Court; or (2) If the decision of the Court of Appeals is in conflict with another decision of the Court of Appeals; or (3) If a significant question of law under the Constitution of the State of Washington or of the United States is involved; or (4) If the petition involves an issue of substantial public interest that should be determined by the Supreme Court.

Wash. R.App. P. 13.4.

**21.** In his dissent from *Greene,* Judge O'Scannlain agreed with the panel majority's dictum: "I agree that if the Washington Supreme

passing in *Roettgen v. Copeland,* 33 F.3d 36, 38 (9th Cir.1994), that under *Castille,* "[s]ubmitting a new claim to the state's highest court in a procedural con text in which its merits will not be considered absent special circumstances does not constitute fair presentation."

Our sister circuits have uniformly interpreted *Castille* to stand for the broad proposition that a petitioner does not fairly raise an issue if she or he seeks review of the federal claim for the first time on discretionary appeal. For example, in a recent Second Circuit case, *St. Helen v. Senkowski,* 374 F.3d 181 (2d Cir.2004), a petitioner raised a federal claim for the first time in a petition for (discretionary) leave to appeal to the New York Court of Appeals, the State of New York's highest court. Relying on *Castille,* the Second Circuit held that this was not sufficient to constitute fair presentation. *Id.* at 183. ("[R]aising a federal claim for the first time in an application for discretionary review to a state's highest court is insufficient for exhaustion purposes.") (citing *Castille* and *Lurie v. Wittner,* 228 F.3d 113, 124 (2d Cir.2000) (a federal constitutional claim has not been exhausted where raised for the first time in an application for discretionary review in the highest court of a state)).

Similarly, in *Parkhurst v. Shillinger,* 128 F.3d 1366 (10th Cir.1997), a habeas petitioner filed a petition for writ of certiorari with the Wyoming Supreme Court requesting reinstatement of his first appeal. In that petition he raised for the first time his ineffective assistance of counsel claim. The Wyoming Supreme Court declined to reinstate the direct appeal, and the Tenth Circuit, also relying on *Castille,* held that petitioner had not fairly presented the federal claim "by first presenting it in a petition for writ of certiorari to the Wyoming Supreme Court." *Id.* at 1368. The *Parkhurst* court reasoned, "[b]ecause of the similarity between Wyoming's Supreme court certiorari petition procedure and the allocution procedure involved in *Castille,* we conclude that petitioner's presentation of his claim to the Wyoming Supreme court via a petition for writ of certiorari was similarly ineffective to exhaust his state remedies." *Id* at 1369.[22]

In *Cruz v. Warden,* 907 F.2d 665, 669 (7th Cir.1990), the Seventh Circuit relied on *Castille* as well: "Submitting a new claim to a state's highest court on discretionary review does not constitute a fair presentation. Thus, merely submitting [petitioner's] expanded claim to the Illinois Supreme Court did not constitute a fair presentation."

■ Because we conclude that Casey raised his federal constitutional claims for the first and only time to the state's highest court on discretionary review, he did not fairly present them.[23]

---

Court declined to reach the claim presented in Greene's motion for reconsideration, then that motion was inadequate to exhaust the claim." 288 F.3d at 1094–95 (O'Scannlain, J., dissenting).

**22.** The court noted that Wyoming's petition for certiorari was also not a matter of right, but is left to the sound discretion of the court. Also, "certiorari will not issue [in Wyoming] where an alternative remedy exists ... Because review under Wyoming's certiorari petition procedure is discretionary and limited,

... petitioner's presentation of his ineffective assistance claim for the first time via that procedure was not fair presentation." *Parkhurst,* 128 F.3d at 1369 (internal citations omitted).

**23.** The district court erred by sidestepping the fair presentation question under the precedent of *Castille* and relying, instead, on *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), for the proposition that federal courts on habeas corpus review are to presume that there is no independent

## D

 Despite that Casey did not fairly present his federal claims to the Washington state courts, he had exhausted his state court remedies at the time that he filed for habeas relief in the federal district court. This is because Casey is procedurally barred from pursuing remedies in state court. *See Harmon v. Ryan,* 959 F.2d 1457, 1460–61 (9th Cir.1992) (explaining that exhaustion can occur by fair presentation to the appropriate state courts or, as here, when some independent and adequate state ground bars relief).

Casey could have brought a timely personal restraint petition under Washington law, and thereby exhausted the unfairly presented federal claims, even though he had not fairly presented his constitutional issues on direct appeal.[24] In Washington, a personal restraint petition may be used to assert the violation of a federal constitutional right even if the defendant did not raise the issue on direct appeal. *See In re Hews,* 99 Wash.2d 80, 660 P.2d 263, 267 (1983) ("We hereby hold the failure to raise a constitutional issue for the first time on appeal is no longer a reason for

and adequate state ground for a state court decision unless the state court opinion states so expressly. This so-called *Harris* presumption is inapplicable here. The Supreme Court designed the presumption as a tool to aid federal courts in determining whether a state court judgment denying relief rested on the merits, or on an independent and adequate state ground. The question in Casey's case is about fair presentation, not about divining the reasons behind the state supreme court's rejection without comment of Casey's claims. As the Supreme Court explained in *Coleman v. Thompson,* 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), "[a] predicate to the application of the *Harris* presumption is that the decision of the last state court to which the petitioner presented his federal claims must fairly appear to rest primarily on federal law or to be interwoven with federal law." Here, it does not "fairly appear" that the Washington State Supreme Court rested its decision to deny discretionary review on *federal law* grounds, or even that its judgment was "interwoven" with federal law, because the supreme court denied the petition without commenting at all.

Similarly, *Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) is inapplicable in this context. In *Ylst,* the Supreme Court turned its attention to cases where, as here, the last state court decision affirmed summarily the lower court's denial of relief without explanation. *Ylst* instructs us to examine "the last *explained* state-court judgment" on the petitioner's federal constitutional claim to see if *it* rested primarily on federal law (as opposed to on a procedural ground denying relief). *Id.* at 805, 111 S.Ct.

2590. *Ylst* tells us that we are to "look through" to the last reasoned opinion; if that last reasoned opinion rests on state law grounds, then an independent bar to our review exists. However, this "look through" technique is not helpful here, where the last reasoned decision could not *possibly* have rested on federal law grounds in light of the fact that any such federal grounds were not even *presented* to the court of appeals. We cannot "look through" to see what the state appeals court did on the merits of Casey's case, because the merits of the federal issue were not raised until Casey appealed.

**24.** Other courts have recognized that if state court paths to exhaustion exist, petitioner should take them or risk procedural default. *See, e.g., Gunter v. Maloney,* 291 F.3d 74, 81–82 (1st Cir.2002) (concluding that petitioner's ineffective assistance of counsel claim, raised for the first time to the state's highest court on discretionary review, did not constitute fair presentation, and noting that the petitioner "could have filed a motion for a new trial as he was entitled to do as of right under Massachusetts law," in collateral proceedings: "[W]here the claim has not been fairly presented on direct appeal, as happened here, it should be fairly presented to the state court through a motion for collateral relief. Because Gunter did not do so, he has not exhausted his claim of ineffective assistance.") (internal citation omitted). *See also Figueroa v. Portuondo,* 96 F.Supp.2d 256, 276–78 (S.D.N.Y.1999) (claim was exhausted notwithstanding failure to raise it on direct appeal because petitioner fully litigated claim in state *coram nobis* proceeding).

automatic rejection of a Personal Restraint Petition.").

However, at the time Casey filed for habeas in federal district court, the one-year time limit for petitioning for a "collateral attack on a judgment and sentence in a criminal case" had expired.[25] Under Wash. Rev.Code § 10.73.090, entitled, "Washington State Procedure for Collateral Attacks on a Conviction. Collateral attack—One year time limit," Casey ran out of time:[26]

> (1) No petition or motion for collateral attack on a judgment and sentence in a criminal case may be filed more than one year after the judgment becomes final if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction.
> (2) For the purposes of this section, "collateral attack" means any form of postconviction relief other than a direct appeal. "Collateral attack" includes, but is not limited to, a personal restraint petition, a habeas corpus petition, a motion to vacate judgment, a motion to withdraw guilty plea, a motion for a new trial, and a motion to arrest judgment.

We have already determined that this time-related procedural statute, Wash. Rev. Code § 10.73.090, provides an independent and adequate state ground to bar federal review. See Shumway v. Payne, 223 F.3d 982, 989 (9th Cir.2000) (holding that the petitioner had "failed to demonstrate that Wash. Rev. Code § 10.73.090 is not an adequate and independent state procedural rule that bars her claims from federal habeas review.").

■■■■ Because at the time Casey filed for habeas relief in the fed eral district court no further state remedies were available to him, his claims are exhausted. See Coleman v. Thompson, 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirement for exhaustion; there are no state remedies any longer available to him.") (internal quotation marks omitted). How ever, because we cannot review a state court decision denying relief if the state court would base its decision on an independent and adequate ground—even, as in this case, a procedural one—Casey is now procedurally defaulted from bringing his claim to federal court. As the Supreme Court explained in Coleman:

> In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without the rule, a federal district court would be able to do in habeas what this Court [the Supreme Court] could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

Id. at 730–31, 111 S.Ct. 2546.

The cases from our sister circuits that we cited supra in our fair presentation analysis also dealt analogously with the

---

**25.** The Washington State Supreme Court denied Casey's petition for review on June 5, 2001. He filed his habeas petition in federal court on August 29, 2002, more than a year after the final entry of judgment.

**26.** So far as we can determine, none of the statutory exceptions applies to him. These exceptions cover newly discovered evidence, conviction by a statute that is later determined to be unconstitutional on its face or as applied, a double jeopardy violation, insufficiency of evidence after a not guilty plea, a sentence imposed in excess of the court's jurisdiction, or a significant change in law.

issue of procedural default. In *St. Helen*, for example, the Second Circuit explained that although the petitioner had not exhausted his federal claim by fairly presenting it to the New York state courts, he *had* exhausted it because it became procedurally barred under a New York state law that bars review if the claim could have been raised on direct review. 374 F.3d at 183–84. Likewise, in *Parkhurst* the Tenth Circuit reasoned that "petitioner could have brought his ineffective assistance of appellate counsel argument in his postconviction petition, thus availing himself of an adequate alternative remedy." 128 F.3d at 1370 (internal citation omitted). The *Parkhurst* court noted that although the petitioner had not fairly presented his federal claim, it was "exhausted in reality because it is clear that his claim is now procedurally barred under Wyoming law." *Id.* Like Casey, the petitioner in *Parkhurst* had not raised the claim in time: "Where

the reason a petitioner has exhausted his state remedies is because he has failed to comply with a state procedural requirement for bringing the claim, there is a further and separate bar to federal review, namely procedural default." *Id.*

The same procedural bar that exhausted Casey's claims (by making it impossible for him to fairly present his federal claims to state court) also renders the federal claims unavailable for our review because they have been defaulted on account of an adequate and independent state law ground.[27]

## VI

Casey has not demonstrated that prejudice could be presumed or that actual prejudice existed as a result of pretrial publicity, so we affirm the district court's denial of his motion to change venue. The state trial court's decision to keep the trial in

---

**27.** If a state procedural bar is an adequate and independent ground warranting dismissal, relief by writ of habeas corpus is foreclosed in federal court unless the petitioner can show cause for the procedural default and resulting prejudice, or show that a failure to consider his claims would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546; *Noltie v. Peterson*, 9 F.3d 802, 804–05 (9th Cir.1993). As for cause, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753, 111 S.Ct. 2546 (internal quotation marks omitted). Casey has not shown that here. Perhaps because Casey has not addressed procedural default, he has also not addressed this issue of cause. And so we do not now consider cause or prejudice.

Nor has Casey shown that his claim requires federal court review to pre vent a miscarriage of justice. *See Calderon v. Thompson*, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) ("The miscarriage of jus-

tice exception is concerned with actual as compared to legal innocence ... To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial. Given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected.") (internal quotation marks and citations omitted). Further, the fundamental miscarriage of justice exception applies only when a constitutional violation probably has resulted in the conviction of one actually innocent of a crime and petitioner supplements his constitutional claim with a colorable showing of factual innocence, which Casey has not done. *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("The fundamental miscarriage of justice exception is available only where the prisoner *supplements* his constitutional claim with a colorable showing of factual innocence.") (internal quotation marks omitted).

Because Casey has not demonstrated cause and prejudice, and because he has not shown that a miscarriage of justice (based on supplementary post-trial evidence) would result from upholding the procedural bar, we do not have grounds to avoid the procedural bar.

Chelan County was not contrary to or an unreasonable application of federal law. Casey's two remaining claims—regarding alleged Confrontation Clause violations and prosecutorial misconduct—were not fairly presented to the Washington state courts, although they were exhausted upon Casey's filing of his habeas petition because no other state remedies then remained available. Casey is now procedurally barred from exhausting these claims properly in Washington state, and an independent and adequate state procedural bar precludes our review of the claims concerning hearsay and prosecutorial misconduct in closing argument. Thus on this appeal, we dismiss these two claims, and we affirm the district court on its determination that pretrial publicity did not require a venue change to preserve due process.

**AFFIRMED in part, DISMISSED in part.**