**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JOSHUA JAMES FROST,
　　　　　　*Petitioner-Appellant*,

　　　　　v.

MARGARET GILBERT,
Superintendent,[*]
　　　　　　*Respondent-Appellee*.

No. 11-35114

D.C. No.
2:09-cv-00725-
TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, Senior District Judge, Presiding

Argued and Submitted En Banc
June 26, 2013—Seattle, Washington

Filed March 21, 2016

Before:  Sidney R. Thomas, Chief Judge, and Stephen
Reinhardt, Alex Kozinski, Kim McLane Wardlaw, Richard
A. Paez, Richard C. Tallman, Johnnie B. Rawlinson, Jay S.
Bybee, Consuelo M. Callahan, Milan D. Smith, Jr. and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Tallman

---

[*] We substitute Superintendent Margaret Gilbert for Patrick Glebe as the respondent-appellee on our own motion.  *See* Fed. R. App. P. 43(c)(2).

## SUMMARY[**]

### Habeas Corpus

On remand from the Supreme Court, the en banc court affirmed the district court's denial of habeas corpus relief to Washington state prisoner Joshua Frost, who challenges his conviction on charges stemming from his participation in a spree of armed robberies and a burglary.

The en banc court held that the King County Superior Court's erroneous refusal to allow defense counsel to make alternative arguments during summation – that the state hadn't met its burden of proof, and that Frost committed the crimes under duress – was harmless because the jury heard overwhelming evidence that Frost committed the charged offenses and any argument that the prosecution failed to meet its burden of proof would have fallen on deaf ears.

The en banc court granted a certificate of appealability as to Frost's claims that the prosecution withheld material, exculpatory evidence in violation of *Brady v. Maryland* and that the prosecution called witness Edward Shaw to testify falsely about the existence of that evidence in violation of *Napue v. Illinois*.

The en banc court held that Frost demonstrated cause for failing to raise the *Brady* and *Napue* claims in his 2008 personal restraint petition. But the en banc court held that Frost cannot show prejudice. The en banc court explained

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that given the evidence of guilt presented at trial, there is no reasonable likelihood that Shaw's false testimony about having only one plea agreement could have affected the judgment of the jury, and there is no reasonable likelihood that the jury could have acquitted Frost based on his duress defense, even if they had learned of an undisclosed signed version of Shaw's plea agreement in a firearm-and-drug possession case or an undisclosed plea agreement in Shaw's domestic-violence case.

In Section II C (in which Judge Nguyen did not join), Judge Kozinski wrote that he and the four joining judges found the facts giving rise to the *Brady* and *Napue* claims most troubling. He wrote that there is cause to believe that the King County Prosecuting Attorney's Office violated *Brady* and *Napue* by willfully withholding evidence of Shaw's domestic-violence plea deal and by permitting Shaw to lie on the stand, and that subsequent to the trial, the office stonewalled in providing Frost this information when he doggedly requested it.

Judge Tallman, joined by Judges Rawlinson, Bybee, Callahan, and M. Smith, concurred in part, dissented in part, and concurred in the judgment denying habeas relief. Judge Tallman wrote that the majority's decision to reverse the en banc court's prior decision declining to certify Frost's remaining claims for appeal, only to deny his meritless *Brady* and *Napue* claims, exceeds the Supreme Court's remand instructions and is a blatant disregard of binding Supreme Court precedent enforcing procedural bars and a lamentable waste of precious judicial resources. He wrote that Section II C, which is not the judgment of this court, launches a groundless, personal attack against several King County

employees who have no way to defend themselves from the defamation.

## COUNSEL

Erik B. Levin (argued), Law Office of Erik Levin, Berkeley, California, for Petitioner-Appellant.

John Joseph Samson (argued), Assistant Attorney General, Corrections Division; Robert W. Ferguson, Attorney General, Olympia, Washington, for Respondent-Appellee.

David M. Porter, Co-Chair, NACDL Amicus Committee, Sacramento, California; Jon M. Sands, Federal Public Defender and Keith J. Hilzendeger, Assistant Federal Public Defender, Phoenix, Arizona, for Amici Curiae Ninth Circuit Federal Public and Community Defenders and National Association of Criminal Defense Lawyers.

**OPINION**

KOZINSKI, Circuit Judge:

In 2003, Joshua Frost was charged in state court with participating in an eleven-day spree of armed robberies and a burglary. Frost's attorney wanted to argue during summation that the state hadn't met its burden of proof and, in the alternative, that Frost committed the crimes under duress. The King County Superior Court erroneously refused to allow counsel to make these alternative arguments, so he chose to argue duress. The Washington Supreme Court held that the superior court's error was harmless. *State* v. *Frost*, 161 P.3d 361, 370–71 (Wash. 2007) (en banc). In a previous en banc opinion, we held that the restriction on Frost's closing argument was structural error. *Frost* v. *Van Boening*, 757 F.3d 910, 918–19 (9th Cir. 2014) (en banc). The Supreme Court reversed. *Glebe* v. *Frost*, 135 S. Ct. 429, 432 (2014) (per curiam). We must now decide whether Frost is nevertheless entitled to habeas relief because the error, though not structural, was prejudicial. In addition, we consider *Brady* and *Napue* issues that the district court did not certify for appeal.

**DISCUSSION**

**I.  The Harmless Error Issue**

Our review of the Washington Supreme Court's harmless-error decision is governed by the Antiterrorism and Effective Death Penalty Act. *See* 28 U.S.C. § 2254(d)(1) (requiring petitioners to demonstrate that a state court's decision on the merits is "contrary to, or involved an unreasonable application of, clearly established [f]ederal law" to obtain

habeas relief). We may reverse the state supreme court's harmlessness determination only if Frost experienced "actual prejudice," that is, where we have "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *See Davis* v. *Ayala*, 135 S. Ct. 2187, 2197–98 (2015) (quoting *O'Neal* v. *McAninch*, 513 U.S. 432, 436 (1995) and *Brecht* v. *Abrahamson*, 507 U.S. 619, 637 (1993)); *see also id.* at 2198–99 (explaining that the *Brecht* standard "subsumes" the requirements of AEDPA, which "sets forth a precondition to the grant of habeas relief" (quoting *Fry* v. *Pliler*, 551 U.S. 112, 119–20 (2007))). Specifically, the inquiry is whether, in light of the record as a whole, the improper limitation on defense counsel's closing argument substantially influenced the verdict. *Brecht*, 507 U.S. at 638–39.

The jury heard overwhelming evidence that Frost committed the charged offenses. The prosecution introduced Frost's recorded confessions, and he testified that he participated in the robberies and the burglary. The prosecution also linked evidence found in Frost's home to the crimes. On this record, any argument that the prosecution failed to meet its burden of proof would have fallen on deaf ears. Accordingly, Frost wasn't prejudiced by the superior court's error in denying him the right to make that argument. *See Brecht*, 507 U.S. at 637–38; *see also Davis*, 135 S. Ct. at 2199.

## II. The *Brady* and *Napue* Issues

Frost maintains that the prosecution withheld material, exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). He claims that the evidence would

have undermined the testimony of Edward Shaw, a key prosecution witness. He also argues that the prosecution called Shaw to testify falsely about the existence of that exculpatory evidence in violation of *Napue* v. *Illinois*, 360 U.S. 264, 269–70 (1959).

Shaw wasn't involved in the robberies and burglary at the heart of the prosecution's case. Rather, he was an acquaintance who testified about how Frost interacted with ringleader Matthew Williams, who Frost claimed coerced him into participating in the crimes. In April 2003, Shaw met with detectives to discuss what he knew about Frost's involvement. At that time, Shaw had pending charges for unlawful possession of drugs and a firearm. Shaw asked for favorable treatment in exchange for information about Frost's criminal activity but the prosecution refused to make a deal. Nevertheless, Shaw disclosed what he knew. Frost was arrested the same day. *State* v. *Frost*, 161 P.3d at 364.

Subsequently, but before Frost's trial, Shaw was charged with second-degree assault with a deadly weapon growing out of a domestic-violence incident. In November 2003, a few weeks before Frost's trial, Shaw signed two plea agreements. He received a nine-month sentence for all his crimes, conditioned on his testifying truthfully against Frost.

At trial, Shaw testified that Frost was "giggling" when Shaw asked whether he was involved in the robberies and burglary. The prosecution highlighted this testimony in its closing: "When Mr. Shaw talked to the defendant about his involvement in these robberies, the defendant was giggling. Does that sound like duress?"

Shaw also testified about the plea agreement for his unlawful-possession case. The prosecution introduced an unsigned version of that agreement. Shaw testified that the signed version was the same as the one the state presented at trial. Shaw didn't mention that he signed a separate agreement resolving his domestic-violence charges, which provided that the sentence for that offense would run concurrently with that for unlawful possession. The prosecution did not disclose the existence of Shaw's domestic-violence plea agreement or otherwise correct his testimony.

Nor was the signed version of Shaw's unlawful-possession plea agreement identical to the unsigned version; it contained a handwritten reference to his domestic-violence case number. The prosecution didn't produce the annotated version of the unlawful-possession plea agreement or the domestic-violence plea agreement. Rather, the prosecution waited until two days after Frost was convicted to file both plea agreements in Shaw's state-court cases. The state doesn't dispute that the prosecution was required by *Brady* to turn over both plea agreements before Frost's trial.

In March 2008, shortly after exhausting his direct appeal, Frost sent a letter requesting "any documentation that could be used to establish the credibility and or expierance [sic] Mr. Shaw has or had as a Police Informant." The public records officer responded by identifying several docket numbers involving Shaw, including his domestic-violence case. The records officer estimated that there were "1000 pages of documents" responsive to Frost's request, which would cost $195.00 to copy and ship. In his reply, Frost explained that he wasn't "looking for complete case files, as that would be quite expensive." Rather, he sought "any documents" that

could show "any special treatment [Shaw] was given in regards to . . . cooperation with [the prosecuting attorney's] office or the King County Police Department." The records officer responded that she did not "find any records responsive to [Frost's] request."

Frost persisted: He wrote back that he knew Shaw had given statements in a particular case, which he identified by number. He asked the records officer to "please try and comb through the above-mentioned case files" for Shaw's statements and "please send [Frost] a list of any and all King County Police Case Numbers brought up in those files." The records officer responded by identifying two docket numbers—neither of which was the domestic-violence case—and informing Frost that she found a statement that Shaw made in the unlawful-possession case file. No documents were provided pertaining to the domestic-violence case. Frost filed a personal restraint petition shortly afterward in which he raised a number of claims for relief, but didn't allege any *Brady* or *Napue* violations.

The undisclosed plea agreements first came to light in 2009 when the Federal Public Defender for the Western District of Washington, appointed by the district court to represent Frost in his federal habeas proceeding, searched Shaw's records at the King County Superior Court Clerk's Office. Counsel quickly filed another personal restraint petition based on this evidence, but the Washington Supreme Court denied it as untimely. The federal magistrate judge found that the supreme court relied on a valid procedural rule in dismissing Frost's *Brady* and *Napue* claims and that Frost hadn't shown cause to overcome this default.

In objecting to the magistrate judge's report and recommendation, Frost argued that the prosecution's continued failure to disclose the domestic-violence plea agreement frustrated his ability to raise timely *Brady* and *Napue* claims. He presented his 2008 communications with the King County Prosecuting Attorney's Office. Accordingly, he asserted that he had cause for his procedural default.

The district judge adopted the magistrate judge's report and recommendation in full. He concluded that Frost's evidence didn't demonstrate that the prosecuting attorney's office engaged in "persistent efforts to suppress" impeachment evidence. The district judge also found that Shaw's testimony wasn't pivotal in light of the prosecution's ample evidence establishing Frost's involvement in the charged crimes. The district judge declined to grant certificates of appealability on Frost's *Brady* and *Napue* claims.

## A.

The standard for granting a certificate of appealability is low. *Shoemaker* v. *Taylor*, 730 F.3d 778, 790 (9th Cir. 2013) (as amended). All that's required is that "reasonable jurists could debate" whether the petition states a "valid claim of the denial of a constitutional right" and whether the district court "was correct in its procedural ruling." *Slack* v. *McDaniel*, 529 U.S. 473, 484 (2000). As explained below, these issues are at least debatable and implicate Frost's constitutional rights. Accordingly, Frost has met the standard for granting a certificate of appealability, and we do so here.

### B.

Because the Washington Supreme Court held that Frost defaulted on his *Brady* and *Napue* claims, he must overcome the default by showing cause and prejudice. *See Strickler* v. *Greene*, 527 U.S. 263, 282 (1999).

*Cause*. Frost started researching his *Brady* and *Napue* claims well before the deadline for filing a personal restraint petition had passed. The Supreme Court denied Frost's petition for certiorari on January 14, 2008, *see Frost* v. *Washington*, 552 U.S. 1145 (Jan. 14, 2008), so he had until January 14, 2009 to seek relief through collateral review. *See* Wash. Rev. Code § 10.73.090(2), (3)(c) (2008). Frost made his first inquiry to the King County Prosecuting Attorney's Office about documents that would call Shaw's credibility into question in March 2008. The dissent faults Frost for not promptly discovering all the documents he was looking for, noting that his federal habeas counsel was able to do so later with ease. Diss. at 28. But federal habeas counsel reviewed Shaw's felony files at the King County Superior Court Clerk's Office. Unlike his federal habeas counsel, Frost was incarcerated, and so had to write to the prosecuting attorney's office to request information. Had the prosecuting attorney's office—which was guilty of hiding the information in the first place—responded accurately to Frost's document requests, he could have filed a timely petition.

Frost first asked for "any documents . . . that could be used to establish the credibility . . . Mr. Shaw has or had as a Police Informant." The records officer represented that she could provide complete case files for $195 or that Frost could narrow his search. It is hardly fair for the dissent to fault Frost for "declining" to buy the entire case files, Diss. at 31,

as $195 is a tremendous amount for an indigent prison inmate. Frost reasonably chose the second option (narrowing the search) by asking for "any documents . . . in regards to any special treatment [Shaw] was given in regards to . . . cooperation with your office or the King County Police Department." Rather than disclosing either of Shaw's plea agreements, the officer responded that she did "not find any records responsive to [Frost's] request." When Frost rephrased his query as for "information . . . that would show [Shaw's] reliability," the records officer again failed to turn anything over. The dissent analyzes the same correspondence between Frost and the King County Prosecuting Attorney's Office but ignores how the public records department's false answers misled Frost about the contents of the files in its possession and thus prevented Frost from obtaining evidence to support his claims. Diss. at 30–32.

The dissent criticizes Frost for abandoning his pursuit of impeachment evidence, Diss. at 31, but he diligently asked for this information on multiple occasions. He was reasonable in abandoning his investigation after the prosecution falsely advised him on repeated occasions that it had no information supporting his *Brady* and *Napue* claims.

That Shaw's plea agreements were not filed until two days after Frost was convicted, even though they had been signed weeks earlier, seems like more than carelessness on the prosecution's part. And its later failure to disgorge Shaw's plea agreements, despite Frost's repeated requests, may amount to "interference by officials" that supplies cause to excuse Frost's procedural default. *Murray* v. *Carrier*, 477 U.S. 478, 488 (1986) (quoting *Brown* v. *Allen*, 344 U.S. 443, 486 (1953)). At the least, it shows "some objective factor external to the defense" that prevented Frost from

complying with Washington's rule setting time limits for bringing personal restraint petitions. *Id.*; *accord Amadeo* v. *Zant*, 486 U.S. 214, 222 (1988).

Frost filed a personal restraint petition in 2008 raising multiple claims for relief. No doubt, he would have presented allegations of *Brady* and *Napue* violations in that petition, had he been aware of the facts supporting those arguments. "[T]he reason for [Frost's] failure to develop facts in [s]tate-court proceedings was the [s]tate's suppression of the relevant evidence." *Banks* v. *Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler*, 527 U.S. at 282). Accordingly, Frost has demonstrated cause for failing to raise his *Brady* and *Napue* claims in his 2008 personal restraint petition. *See, e.g.*, *Amadeo*, 486 U.S. at 222 (finding "ample cause to excuse [a petitioner's] procedural default" where county officials concealed a key document and counsel had no tactical reason for failing to raise the claim); *Crawford* v. *Head*, 311 F.3d 1288, 1327 (11th Cir. 2002) (petitioner demonstrated cause where state failed to disclose *Brady* material in its possession despite multiple requests from counsel); *Crivens* v. *Roth*, 172 F.3d 991, 995 (7th Cir. 1999) (petitioner had cause to overcome procedural default of *Brady* claim where prosecution didn't provide the criminal record of its witness until after the habeas petition was filed).

*Prejudice*. While Frost has shown cause, he cannot show prejudice. Given the evidence of guilt presented at trial, there is no "reasonable likelihood" that Shaw's false testimony about only having one plea agreement could have "affected the judgment of the jury." *Sivak* v. *Hardison*, 658 F.3d 898, 912, 914 (9th Cir. 2011) (quoting *Jackson* v. *Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008)) (finding no prejudice at trial from a *Napue* violation where the defendant's own testimony and

physical evidence "pointed to his guilt"). Had the jury learned of Shaw's second plea agreement, there is no "reasonable probability" that the outcome would have been different. *See Strickler*, 527 U.S. at 296.

Shaw's undisclosed domestic-violence offense carried a maximum sentence of five years—the same as his unlawful-possession offenses. It is unlikely that the prosecution could have put pressure on Shaw to change his testimony by threatening to seek consecutive sentences for his offenses. In Washington, there is a presumption that sentences imposed at the same time will be served concurrently. Wash. Rev. Code § 9.94A.589(1)(a); *State* v. *Vance*, 230 P.3d 1055, 1058–59 (Wash. 2010) (en banc). Nothing in the record suggests that the state could have overcome this presumption. Neither of Shaw's crimes were "serious violent offenses." Wash. Rev. Code § 9.94A.030(37) (2002) (defining "serious violent offense"); *id.* § 9.94A.589(1)(b) (requiring consecutive sentences for defendants who've committed two or more serious violent offenses). Nor is there evidence of any other factor that Washington courts normally rely on in justifying consecutive sentences, such as the use of a "high degree of sophistication or planning," or an abuse of a "position of trust." *See id.* § 9.94A.535(2)(e)(v)–(vi).

While Frost could have shown that Shaw was a bad guy because he not only unlawfully possessed a firearm and drugs but also assaulted his girlfriend, it wouldn't have gotten him far. The jury already knew that Shaw received benefits in exchange for his testimony. The jury also heard that Shaw gave information about Frost's crimes to the police even after they declined a deal on his pending unlawful-possession charges. And the jury was aware that Shaw approached

authorities with information about Frost in April, well before he committed the assault in August.

Any impact of this impeachment evidence would have been vitiated by Frost's own testimony, which cast doubt on his duress defense. Frost didn't have a good answer for why he didn't attempt to escape from Williams when he had a chance. He admitted that he was left alone in the car when his accomplices committed one of the robberies. Frost also admitted that he picked up Williams on several occasions, as Williams didn't have a car. Frost acknowledged that he never tried to get his mother and brother to a safe place in response to Williams's alleged threats against them. Nor did he call 911, although he'd previously done so when he felt threatened by others. Finally, Frost admitted that, during his first interview with the police, he didn't say that he had been threatened by Williams, even though the officer twice urged him to say "anything" he wanted. There's no reasonable likelihood that the jury could have acquitted Frost based on his duress defense, even if they had learned of the undisclosed plea agreements.

## C.***

Although we conclude that Frost is not entitled to relief, we find the facts giving rise to his *Brady* and *Napue* claims most troubling. As the matter has been presented to us, there is cause to believe that the King County Prosecuting Attorney's office violated *Brady* and *Napue* by willfully withholding evidence of Shaw's domestic-violence plea deal and by permitting Shaw to lie on the stand. That this was a deliberate tactic rather than an oversight is demonstrated by

---

*** Judge Nguyen does not join this section of the opinion.

the fact that the prosecution kept Shaw's signed plea agreements secret until two days after Frost was convicted, even though they had been signed well before Frost's trial commenced and thus should have been turned over to the defense at once. Moreover, subsequent to the trial, the office stonewalled in providing Frost this information when he doggedly requested it.

So far as we are aware, the individuals involved have never been held to account for their conduct. As the dissent acknowledges, the deputy prosecuting attorney in Frost's case, Zachary Wagnild, introduced into evidence an unsigned plea agreement that he suffered the witness to testify was identical to the signed version. Diss. at 23. The difference between the two documents was material, as the signed version revealed the existence of the second plea deal. The dissent chalks this all up to a case of "the left hand [not knowing] what the right hand was doing" in a busy office with multiple prosecuting attorneys. Diss. at 34–35. But it's more akin to one hand washing the other. We know that Wagnild was aware of the domestic-violence case because he signed the plea agreement in the unlawful-possession case, which referred to Shaw pleading guilty in his domestic-violence case. The unlawful-possession agreement was dated November 26, 2003—before Frost's trial. There was thus no reason to use an unsigned version where the signed version was available and had, in fact, passed through Wagnild's hands. Yet Wagnild did not produce the signed plea agreement as required by *Brady*, and he failed to correct Shaw's representation that the two versions were identical (but for the signature). Having himself signed the original, he was charged with knowledge of its contents; he certainly knew how to get the original to confirm that the documents were indeed identical. Allowing a prosecution witness to

testify falsely when the truth is easily verifiable not only violates *Napue* but would also amount to professional misconduct.

We are also troubled by the conduct of Gary Ernsdorff, the deputy prosecuting attorney who handled Shaw's domestic-violence case. Shaw's plea agreement in the domestic-violence case referenced his unlawful-possession plea agreement, which obligated him to testify truthfully in Frost's case. It is possible, though unlikely, that filing the plea agreement in Shaw's domestic-violence case two days after the jury returned its verdict in Frost's case was mere coincidence. But filing it on the same day as the unlawful-possession plea agreement bespeaks coordination and planning. The domestic-violence plea agreement had been signed on November 3, a month before Frost's trial even began, but it was kept secret until it was too late for Frost to use it in his defense. The state has offered no explanation for delaying the filing of both plea agreements until after the jury returned its verdict in Frost's case. The dissent sees this all as innocent carelessness, but to us it's at least one coincidence too far. The sequence of events raises the inference that Ernsdorff collaborated with Wagnild to conceal the agreement from Frost until Wagnild had secured a guilty verdict. If so, this would be shameful misconduct on the part of both prosecuting attorneys, which not even the dissent denies.

Finally, we are concerned by the actions of Kelli Williams, the public records officer for the King County Prosecuting Attorney's office at the time Frost sought information about Shaw. Frost asked that office, in every way he knew how, for the information that would have supported his *Brady* and *Napue* claims. Yet Williams

provided incorrect or misleading information in response to his requests. Her failure to identify and disclose either plea agreement to Frost may be the result of incompetence or indolence, but it may also reflect a deliberate effort to prevent disclosure of the deception committed by her office.

Although the Washington courts presumably have been aware of these facts for some time, we have been apprised of no sanctions against these individuals, nor any inquiry conducted by the courts. Nor have we heard of any effort to hold Shaw accountable for the perjury he almost certainly committed in his testimony in Frost's case or to determine the degree to which he may have been aided in that endeavor by prosecuting attorney Wagnild.

We are mindful that there may be circumstances of which we are unaware that cast the matter in a different light. Yet, unlike the dissent, we do not believe this is a sufficient reason to keep silent. The individuals we have named may wish to furnish a copy of this opinion to the state bar and seek to clear their names by providing an explanation for its consideration. This would seem to be the prudent course.

*    *    *

Because Frost can't show prejudice as a result of the errors committed at his trial, he is entitled to no relief in federal court.

**AFFIRMED.**

TALLMAN, Circuit Judge, joined by RAWLINSON, BYBEE, CALLAHAN, M. SMITH, Circuit Judges, concurring in part, dissenting in part, and concurring in the judgment denying habeas relief:

Part II of today's opinion is an imprudent exercise of Article III judicial power.  It is all the more so because the Supreme Court reversed our previous en banc decision in Frost's case and held that the trial court's restriction on Frost's closing argument was not structural error as we had declared.  *Glebe v. Frost (Frost IV)*, 135 S. Ct. 429, 431–32 (2014) (per curiam).  The Supreme Court remanded the case, directing us to conduct a harmlessness analysis.  *See id.* at 432 ("The Court of Appeals did not address [whether the state court was unreasonable to find harmlessness] when sitting en banc, and it is not before us today. . . . We reverse the judgment of the Court of Appeals for the Ninth Circuit and remand the case for further proceedings consistent with this opinion.").  In Part I, we now all agree that the trial court's error did not have a "substantial and injurious effect or influence in determining the jury's verdict" in light of the overwhelming evidence of Frost's guilt for the numerous crimes he committed in his eleven-day crime spree.  *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)); *see* Maj. Op. at 5–6.

That should have been the end of the matter.  The mandate should have issued promptly after affirming the district court's denial of Frost's petition for habeas corpus.  Yet, Part II exceeds the Supreme Court's remand instructions and now resurrects Frost's procedurally defaulted *Brady* and *Napue* claims when *three* courts, including this same en banc panel, previously declined to certify Frost's remaining claims for appeal.  *See Frost v. Van Boening (Frost I)*, No.

C09–725Z, 2011 WL 486198, at *1–2 (W.D. Wa. Feb. 4, 2011) (denying a certificate of appealability as to claims 1, 2, and 4 of Frost's amended habeas petition); *Frost v. Van Boening (Frost II)*, 692 F.3d 924, 927 n.3 (9th Cir. 2012), *superseded on reh'g en banc*, 757 F.3d 910 (9th Cir. 2014) ("Having considered Frost's arguments, we are satisfied that none of his other claims meet [the standard to obtain a certificate of appealability]."); *Frost III*, 757 F.3d 910, 919 (9th Cir. 2014) (en banc) ("[We] decline to expand the certificate of appealability.").

All eleven judges on this en banc panel previously considered Frost's procedurally defaulted claims. We could not have been more clear in our previous en banc decision. *Frost III*, 757 F.3d at 919. Frost did not file his own petition for certiorari challenging this ruling, and the Supreme Court did not grant certiorari on this issue. Our decision not to expand the certificate of appealability to consider Frost's procedurally defaulted claims is now the "law of the case," and the majority errs by "reconsider[ing] an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez v. Arizona*, 677 F.3d 383, 390 n.4 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013). The majority's untimely and injudicious attempt to rewrite history to now consider Frost's *Brady* and *Napue* claims greatly "compromise[s] the orderly, decorous, rational traditions that [we] rely upon to ensure the integrity of [our] own judgments." *Hollingsworth v. Perry*, 558 U.S. 183, 197 (2010).

By my count, this is Frost's fifth effort to collaterally attack what we all agree is a valid conviction for crimes committed in April 2003. This latest *sua sponte* "endless

repetition of inquiry" into the facts surrounding Frost's conviction disrupts congressional intent in enacting the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) to conserve judicial resources, avoid piecemeal litigation, and eliminate delays in the federal habeas review process. *See McCleskey v. Zant*, 499 U.S. 467, 492 (1991); *Gonzalez v. Thaler*, 132 S. Ct. 641, 650 (2012) ("Congress's intent in AEDPA [was] 'to eliminate delays in the federal habeas review process.'") (quoting *Holland v. Florida*, 560 U.S. 631, 648 (2010)).

Section II C of Judge Kozinski's opinion—for which there is no majority—launches a groundless, personal attack against several King County employees who have no way to defend themselves from the defamation. Judge Kozinski's quiver is full, and Section II C of his "opinion" loosens several arrows directed at the King County Prosecutor's Office and the Sheriff's Department. The attack in Section II C is mounted notwithstanding the ultimate conclusion that Frost still *loses* because he cannot establish prejudice from the revived constitutional violations. Article III of the United States Constitution is not a roving commission permitting federal judges to use their opinions as a platform to launch such ad hominem attacks. Section II C of Judge Kozinski's opinion is not the judgment of this court.

# I

The crux of Frost's *Brady* and *Napue* claims is that the prosecutor knowingly elicited false testimony and suppressed impeachment evidence relating to a trial witness, Edward Shaw. Prior to Frost's arrest, Shaw had learned about Frost's involvement in the robberies and reported this knowledge to law enforcement. At the time of his meeting with law

enforcement, Shaw had been charged with: (1) unlawful possession of a firearm in the first degree and (2) possession for sale of a controlled substance (the "gun and drugs" case). Shaw asked the State for leniency on these two charges in exchange for information about Frost, but the State refused to make a deal. Shaw, nonetheless, told sheriff's detectives what he knew about Frost's criminal activities. Frost was arrested, incriminating evidence was seized, and he confessed (three times).

Shaw was subsequently charged with a third crime, second-degree assault with a deadly weapon stemming from a domestic violence incident (the "domestic violence" case). Before Frost's trial, Shaw entered into a plea agreement in the gun and drugs case. After trial, Shaw also pled to the domestic violence charge. The state agreed to reduce Shaw's charges in the gun and drugs case in exchange for his testimony at Frost's trial. In the space marked "Other" on Shaw's gun and drugs plea agreement, dated November 3, 2003, the following was handwritten: "Testify truthfully in State v. Frost . . . as set forth in agreement. Plead guilty to 03-1-02187-0 (domestic violence assault case)." Shaw's plea agreement in the domestic violence case, also dated November 3, 2003, provides: "This plea is part of a two-case offer." The State also recommended that Shaw's nine-month sentence in the domestic violence case be imposed concurrently with the sentence imposed on the gun and drugs charges.

At Frost's trial, Shaw testified about a conversation he had with Frost the night before Frost's arrest. In this particular conversation, Shaw asked Frost whether he had committed the recent robberies in the area. Shaw testified that Frost "started giggling" in response. Shaw further

testified that he was motivated to contact the police after this conversation "[b]ecause what they were doing was not right. They beat old people, and after somebody gives them what they want they would shoot them. That is not right by me." In addition, the prosecution introduced an unsigned version of the prosecution's plea offer letter in the gun and drugs case, which did not reference Shaw's domestic violence case. Shaw did not mention his domestic violence agreement at trial and also testified that the unsigned letter was identical to the offer letter that he had signed. Therefore, the details of Shaw's domestic violence agreement were never disclosed to Frost at trial. It was not until two days after Frost's conviction that Shaw's plea agreement and the prosecutor's sentencing recommendation in both the gun and drugs case and the domestic violence case were finalized on December 18, 2003. On that day, Shaw pled guilty and the fully signed plea agreements were filed in open court before a superior court judge different from the judge presiding over Shaw's criminal cases.

On May 26, 2009, after two unsuccessful rounds of collateral state habeas litigation (called "personal restraint petitions" in Washington), Frost raised his *Brady* and *Napue* claims for the first time. Then Frost got new lawyers, federal public defenders in place of state criminal counsel. Frost's third personal restraint petition was filed in state court after his investigator at the Federal Public Defender's Office reviewed Shaw's criminal history and discovered the undisclosed plea agreement in the domestic violence case. Frost argued that the State knowingly elicited the false testimony of Shaw at trial and that the suppression of Shaw's domestic violence plea agreement precluded him from impeaching Shaw's credibility. The Washington State Supreme Court dismissed Frost's five-year-old claims as time

barred under Wash. Rev. Code § 10.73.090, Washington's one-year time limit for petitioning for a "collateral attack on a judgment and sentence in a criminal case." It held that Frost failed to meet the exception for "newly discovered evidence" because he had not acted with "reasonable diligence" in discovering the impeaching evidence, which had been publicly available since December 18, 2003.

On February 26, 2010, Frost filed an amended federal habeas petition and raised a number of grounds for relief, including for the first time here that he was denied due process under the Fourteenth Amendment when the State knowingly withheld material exculpatory evidence and that his Sixth and Fourteenth Amendment rights were violated when the State knowingly elicited the false testimony of Shaw. On October 5, 2010, United States Magistrate Judge Brian A. Tsuchida issued a Report and Recommendation, which recommended that the district court deny Frost's amended habeas petition. The Report and Recommendation concluded that Frost's *Brady* and *Napue* claims were procedurally defaulted and should be dismissed for that reason.

On February 4, 2011, United States District Judge Thomas S. Zilly adopted the Report and Recommendation and dismissed the habeas petition with prejudice. In addition, the district court denied a certificate of appealability as to Frost's *Brady* and *Napue* claims. *Frost I*, 2011 WL 486198 at *1–2. Likewise, our prior three judge panel and this en banc court denied Frost's request that we expand the certificate of appealability to address these issues. *Frost II*, 692 F.3d at 927 n.3; *Frost III*, 757 F.3d at 919. As a result, Frost was not permitted to appeal the dismissal of his *Brady* and *Napue* claims. Part II of today's opinion now reverses

course and expands the certificate of appealability to resuscitate these claims, concluding that "reasonable jurists could debate" whether the district court "was correct in its procedural ruling." Maj. Op. at 10. I disagree.

Frost presents a classic case of procedural default. We do violence to principles of comity and federalism by failing to stand by our previous rulings. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) ("The procedural default doctrine and its attendant 'cause and prejudice' standard are 'grounded in concerns of comity and federalism.'") (citing *Coleman v. Thompson*, 501 U.S. 722, 730 (1991)); *see also Murray v. Carrier*, 477 U.S. 478, 491 (1986).

## II

Frost's right to appeal the dismissal of his *Brady* and *Napue* claims "is governed by the certificate of appealability (COA) requirements now found at 28 U.S.C. § 2253(c)." *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). Specifically, Frost is entitled to a COA on these issues only if he "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Frost "satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

However, the inquiry becomes "somewhat more complicated where, as here, the district court dismisses the petition on procedural grounds." *Slack*, 529 U.S. at 484. In such cases, the Supreme Court has instructed:

> When the district court denies a habeas
> petition on procedural grounds without
> reaching the prisoner's underlying
> constitutional claim, a COA should issue
> when the prisoner shows, at least, that jurists
> of reason would find it debatable whether the
> petition states a valid claim of the denial of a
> constitutional right *and* that jurists of reason
> would find it debatable whether the district
> court was correct in its procedural ruling. . . .
> *Where a plain procedural bar is present and
> the district court is correct to invoke it to
> dispose of the case, a reasonable jurist could
> not conclude either that the district court
> erred in dismissing the petition or that the
> petitioner should be allowed to proceed
> further.  In such a circumstance, no appeal
> would be warranted.*

*Id.* (emphasis added).

It  follows that determining whether a COA should issue
on Frost's procedurally defaulted claims has two components,
"one directed at [his] underlying constitutional claims and
one directed at the district court's procedural holding." *Id.* at
484–85.  The Supreme Court has encouraged us to first
resolve the procedural issues, especially if that inquiry would
end the case. *Id.* at 485.  For this reason, I initially address
the second component of the § 2253(c) inquiry, "whether
jurists of reason could conclude that the [d]istrict [c]ourt's
dismissal on procedural grounds was debatable or incorrect."
*Id.*

## III

The district court dismissed Frost's *Brady* and *Napue* claims as procedurally defaulted. *Frost I*, 2011 WL 486198 at *1–2, *adopting* No. C09–725–TSZ–BAT, 2010 WL 5775657 at *4 (W.D. Wa. Oct. 5, 2010) (report and recommendation). More specifically, the district court found that Frost's failure to raise these claims within one year after his judgment, as required by Washington law, provided an "independent and adequate state ground to bar habeas review." *Id.*; *see also Casey v. Moore*, 386 F.3d 896, 920 (9th Cir. 2004) ("We have already determined that this time-related procedural statute, Wash. Rev. Code § 10.73.090, provides an independent and adequate state ground to bar federal review."). The district court's decision was absolutely correct and, therefore, no further consideration on appeal is warranted.

## A

To show cause, Frost must show the existence of "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488. Frost fails to show that "the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence." *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

Frost provides no justification as to why he failed to raise his *Brady* and *Napue* claims during the five-and-a-half years between when Shaw's plea deal was made publicly available and when he filed his third state habeas petition. How could he? The information was available on the public docket two days after the jury found him guilty in 2003. Frost fails to

explain why he could not have raised these issues on direct appeal or in either of his first two state habeas petitions. While Frost may not have been able to raise his *Brady* and *Napue* claims *before* his conviction, he could have done so in a timely post-conviction proceeding when the information became part of the public record. *See McCleskey*, 499 U.S. at 497 ("That [petitioner] did not possess, or could not reasonably have obtained, certain evidence fails to establish cause if other known or discoverable evidence could have supported the claim in any event.").

In fact, when Frost's investigator finally got around to reviewing Shaw's complete court files in 2009, he easily found Shaw's domestic violence plea deal. The ease by which Frost's investigator obtained the impeaching evidence trenchantly demonstrates that Frost could have brought his *Brady* and *Napue* claims as early as 2003 if he had conducted a "reasonable and diligent investigation." *Id.* at 498. His failure to do so does not constitute cause. *See id.*; *see also Henry v. Ryan*, 720 F.3d 1073, 1083 (9th Cir. 2013) (no cause established when petitioner suspected and had evidentiary support for his *Brady* claim prior to federal habeas proceedings); *Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007) ("Where, like here, 'the factual basis for a claim' is 'reasonably available to' the petitioner or his counsel from another source, the government is under no duty to supply that information to the defense.") (quoting *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999)).

Two Supreme Court cases *Strickler v. Greene*, 527 U.S. 263 (1999), and *Banks v. Dretke*, 540 U.S. 668 (2004), demonstrate why Frost has not established cause. In both *Strickler* and *Banks*, the Court held that cause existed after the prosecution withheld exculpatory evidence at trial and

throughout state post-conviction proceedings. *Strickler*, 527 U.S. at 273–75; *Banks*, 540 U.S. at 675. In *Strickler*, the petitioner did not seek discovery of possible exculpatory evidence because the prosecutor maintained an "open file policy," which purportedly gave the petitioner access to all of the prosecutor's files. 527 U.S. at 276–78. The prosecution in *Strickler* then withheld investigative notes and letters that would have "cast serious doubt" on a key trial witness's testimony. *Id.* at 273. Similarly, in *Banks*, the State advised the defense that there "would be no need to litigate discovery issues," because the State would "without the necessity of motions, provide [the defense] with all discovery to which [the defense was] entitled." 540 U.S. at 675 (internal alternation omitted). However, the prosecution in *Banks* failed to disclose that an essential prosecution witness was a paid police informant and that another key witness had been intensively coached by prosecutors. *Id.*

Frost's case is inapposite in several important respects. First, unlike the "long-suppressed evidence" in *Strickler* and *Banks*, the impeaching evidence Frost now relies on was not suppressed during Frost's post-conviction proceedings. *Cf. Banks*, 540 U.S. at 675. Importantly, the prosecution never "assert[ed] during state habeas proceedings that [Frost] had already received everything known to the government." *Strickler*, 527 U.S. at 289; *Banks*, 540 U.S. at 692–93. And unlike investigative notes or memoranda that are in the exclusive possession of the government, Shaw's plea deals were part of the public record beginning in December 2003 shortly after the jury returned its verdict against Frost. *Cf. Strickler*, 527 U.S. at 273–75. The State had no duty to provide this reasonably available information to Frost. *See Matthews*, 486 F.3d at 890–91. Finally, Frost knew during trial that Shaw had entered into an agreement for a reduced

sentence on the gun and drugs charges in exchange for his testimony at Frost's trial. Frost says he suspected that the prosecution withheld information regarding its agreement with Shaw. If Frost would have reviewed Shaw's plea deal in the gun and drugs case, he would have learned of Shaw's domestic violence plea agreement. His failure to do so "was his own failure, and not a failure caused by the [prosecution] or some other external factor." *Id*. at 891.

The majority suggests that the King County Prosecutor's Office deliberately withheld Shaw's plea deals from Frost in 2008. The majority's brazen accusations are entirely unsupported by the record, and the letters between Frost and the Prosecutor's Office tell a much different story than the majority strains to tell. Lest there be any doubt on this issue, I discuss each letter exchanged between Frost and the King County Prosecutor's Office in response to his subsequent public records requests.

On March 22, 2008, five years after his conviction, Frost first wrote to the Prosecutor's Office to request "any documents, statements, and/or reports that purtain [sic] to EDWARD G. SHAW." The Public Records Officer, Kelli Williams, promptly informed Frost on April 1, 2008, that she had "located four (4) case files for Edward G. Shaw that [she] believed [were] responsive to [Frost's] request." The letter provided Frost with the criminal charge and court case number associated with each of these four cases and offered to photocopy the *complete* case files at a cost of $195. Notably, Shaw's domestic violence case was included in this list of cases. Frost declined to look at it.

On April 3, 2008, Frost wrote that he was "not looking for [Shaw's] complete case files" and limited his request solely

to documents "that could be used to 'DETERMINE WHETHER OR NOT MR. SHAW HAS WORKED AS A STATE OR POLICE INFORMANT.'" [Emphasis in original] By letter dated April 14, 2008, Williams clarified that she was "unable to search [the] files by names of witnesses or informants" but she offered to search through any particular case files if Frost could provide her with the "police incident number" or "court cause number."

By reply letter the next day, Frost further limited his public records request to just two case files: (1) documents contained in his own case file from his 2003 trial, and (2) documents contained in Shaw's gun and drugs case file. In this April 15 letter, Frost further narrowed his request to "statements given by Eddy Shaw" and "any and all King County Police Case Numbers brought up in those files." On April 28, 2008, Williams wrote back to confirm her understanding of Frost's now twice-amended records request for "Eddie Shaw's statements and King County Sheriff (Police) case numbers" in the case files associated with Frost's 2003 trial and Shaw's gun and drugs case. Finally, on May 8, 2008, Williams wrote Frost that she was able to locate "one statement of Eddie Shaw" in the gun and drugs case file.

After receiving this last letter, Frost ceased all communication with the Prosecutor's Office. He does not explain why he abandoned his search or why he declined to pay for copying to review any documents associated with Shaw's domestic violence case. In addition, Frost provides no justification as to why he limited his request solely to Shaw's police statements and declined to review Shaw's plea deal in the gun and drugs case. If Frost had reviewed the gun and drugs plea deal, he would have discovered Shaw's domestic violence case referenced therein. It was certainly

not hidden. While the majority tries to paint a nefarious picture of deliberate prosecutorial misconduct and complicity, the record currently before us instead tells a different story. It shows that the Prosecutor's Office responded promptly and accurately to all of Frost's record requests. It shows that the Prosecutor's Office offered to send Frost *all* of the documents associated with Shaw's criminal history, including Shaw's plea deals in the gun and drugs case and in the domestic violence case. Frost, however, declined to review these documents. Therefore, Frost has not shown cause to excuse his procedural default, and the majority errs by concluding otherwise.

**B**

But even if Frost could show cause, he certainly cannot show prejudice. To show prejudice for his *Brady* claim, Frost must show a "'reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler*, 527 U.S. at 289. To show prejudice for his *Napue* claim, Frost must show a "reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Sivak v. Hardison*, 658 F.3d 898, 912 (9th Cir. 2011) (internal citation and quotation omitted).

The majority agrees that Frost cannot show such prejudice. Maj. Op. at 13–15. This is not surprising considering the evidence of guilt at Frost's trial was overwhelming. Frost gave three taped confessions, all of which were entered into evidence at trial, and Frost testified in detail about his involvement in the eleven-day home invasion and commercial robbery spree. Further, as the majority observes, Shaw's undisclosed plea deal in the

domestic violence case added little impeachment value considering the jury was already informed that Shaw had received leniency from sentencing on other serious felonies in exchange for his testimony against Frost. Maj. Op. at 14. The majority correctly concludes that "there is no 'reasonable likelihood'" that Shaw's false testimony about only having one plea agreement could have 'affected the judgment of the jury,'" and that "there is no 'reasonable probability' that the outcome [at Frost's trial] would have been different" had the jury learned of Shaw's second plea agreement, which had not yet been accepted by a different judge. Maj. Op. at 13–14.

In other words, the majority *agrees* that the district court's dismissal of Frost's *Brady* and *Napue* claims was correct. In these instances—"[w]here a plain procedural bar is present and the district court is correct to invoke it to dispose of the case"—the Supreme Court has clearly instructed that "no appeal [is] warranted." *Slack*, 529 U.S. at 484. The majority's decision to reverse our prior opinion and to now expand the COA only to deny these meritless claims is a blatant disregard of binding Supreme Court precedent enforcing procedural bars and a lamentable waste of precious judicial resources.

## IV

Section II C of Judge Kozinski's opinion launches a groundless, personal attack against named employees of the King County Prosecutor's Office. Indeed, he has not garnered support from a majority of the court to support it. Section II C is not the ruling of our en banc court; it is merely hortatory.

The Section accuses several King County employees of "professional misconduct," providing "incorrect or misleading information," and "stonewall[ing]" Frost. Op. at 15–18. Incredibly, no discovery has been conducted on these issues; nor has an evidentiary hearing taken place. That's not surprising given the undisputed fact that the claim was ruled procedurally defaulted by both state and federal courts. Nonetheless, Judge Kozinski engages in sheer speculation without any factual basis to support raw supposition. But what we do have in the record thus far provides no support for this unwarranted assault. Sadly, Judge Kozinski elects himself finder of fact in order to hold the individuals "to account for their conduct" and then exhorts these individuals to "seek to clear their names" with the state bar. Op. at 16, 18.

The Section accuses Zachary Wagnild, the deputy prosecuting attorney in Frost's case and Shaw's gun and drugs case, of willfully and deliberately withholding Shaw's domestic violence plea agreement and permitting Shaw to lie on the stand. Op. at 15–17. It also accuses Gary Ernsdorff, the deputy prosecuting attorney in Shaw's domestic violence case, of engaging in complicity to keep Shaw's domestic violence plea deal secret. Op. at 17.

These reckless accusations are made without any knowledge of the actual facts. Section II C fails to consider the possibility that Wagnild did not know about Shaw's domestic violence plea deal at the time of Frost's trial or the possibility that Shaw's plea deals were not signed or fully completed until entered in open court on December 18, 2003, *after* Frost's trial. It is also likely that Shaw's gun and drugs case and domestic violence case were handled by two different units in Washington State's largest county

prosecutor's office, resulting in a classic case of "the left hand didn't know what the right hand was doing." The bottom line is, we just don't know what happened. Yet, the Section automatically assumes the worst of these two King County prosecutors and, as a result, brands them with a scarlet letter.

Section II C also accuses Kelli Williams, a non-attorney Public Records Officer, of providing "incorrect or misleading information," and declares Williams to be either incompetent, indolent, or deliberately deceptive. Op. at 17–18. Nonsense. As shown by the 2008 letters, Williams promptly and accurately responded to Frost's record requests and offered to provide Frost with all of the information he needed. Williams may not have even *known* Wagnild or Ernsdorff or even been a King County employee at the time of Frost's trial. It is highly likely that she had absolutely *no* prior knowledge of Frost's case, especially considering that Frost's public records request came five years after his conviction. Yet, once again, the author assumes the worst: that Williams deliberately hid "the deception committed by her office." Op. at 17–18.

Ultimately, Section II C is used as a platform to offer the author's "two-cents" on the supposed inner-workings of Washington's criminal justice system. Along the way, the character and integrity of several public employees is tarnished. Thankfully, a majority of the court has refused to join in this indefensible and intemperate attack.

I respectfully dissent as to Part II of the majority opinion. I concur as to Part I and in the judgment denying habeas relief.